UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROMANUS CASTRO,<br><br>       Plaintiff,<br><br>  v.<br><br>JOHN CUSACK; THE WILLIAM MORRIS AGENCY; DANNY STRONG; LEE DANIELS; HANK AZARIA; BOB LOWRY; IMAGINE TELEVISION; 20TH CENTURY FOX TELEVISION ENTERTAINMENT GROUP AND SUBSIDIARIES; LITTLE CHICKEN PRODUCTIONS; SONY PICTURES TELEVISION; 50 CANNON ENTERTAINMENT; BOB LOWRY TELEVISION; LEE DANIELS ENTERTAINMENT; DANNY STRONG PRODUCTIONS; COQUETTE PRODUCTIONS; MATTHEW CARNAHAN CIRCUS PRODUCTIONS; TOUCHSTONE TELEVISION; ABC STUDIOS; SHOWTIME NETWORK; DOES 1-20,<br><br>       Defendants. | CASE NO. 15-CV-6714-ENV-LB<br><br>**MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANTS SHOWTIME NETWORKS INC. AND SONY PICTURES TELEVISION INC. TO:**<br>**(1) DISMISS PLAINTIFF'S AMENDED COMPLAINT WITH PREJUDICE AND (2) STRIKE PLAINTIFF'S REQUEST FOR PUNITIVE DAMAGES**<br><br>**APPENDIX A FILED CONCURRENTLY HEREWITH**<br><br>**Date of Service:** September 30, 2016 |

MITCHELL SILBERBERG & KNUPP LLP

David B. Gordon
DG0010
12 East 49th Street
New York, New York 10017
dbg@msk.com
Telephone: (212) 509-3900
Facsimile: (212) 509-7239

Elaine K. Kim (*pro hac vice*)
11377 West Olympic Boulevard
Los Angeles, California 90064
ekk@msk.com
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

Attorneys for Showtime Networks Inc. (erroneously sued as Showtime Network) and
Sony Pictures Television Inc. (erroneously sued as Sony Pictures Television)

# **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ...................................................................................... 1

II.     PROCEDURAL AND FACTUAL BACKGROUND.......................................... 2

      A.      Judgment Dismissing Plaintiff's First Lawsuit Regarding *Huff* ........................ 2

      B.      Plaintiff's Allegations in This Action ................................................ 2

      C.      *Huff* Television Series ............................................................... 3

      D.      Plaintiff's Alleged Work, The Summit of Beauty and Love (*TSOBAL*) ............... 6

III.    FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6) STANDARD ............................. 8

IV.     ARGUMENT ........................................................................................ 9

      A.      Plaintiff's Entire Action Against Movants Is Barred by *Res Judicata* ................... 9

      B.      Plaintiff Cannot State a Claim for Copyright Infringement as a Matter of Law .. 10

            1.      Plaintiff Fails to Plausibly Allege Access by Movants to *TSOBAL* ......... 12

            2.      *Huff* and *TSOBAL* Are Not Substantially Similar as a Matter of Law...... 13

      C.      Plaintiff's Second Cause of Action Is Preempted by the Copyright Act ............. 24

      D.      All of Plaintiff's Causes of Action Against Showtime Are Time-Barred ........... 25

V.      CONCLUSION ..................................................................................... 25

i

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Alexander v. Haley*,
   460 F. Supp. 40 (S.D.N.Y. 1978) ........................................................................20

*Alexander v. Murdoch*,
   2011 U.S. Dist. LEXIS 79543 (S.D.N.Y. May 27, 2011)................................17, 22

*Allen v. Scholastic Inc.*,
   739 F. Supp. 2d 642 (S.D.N.Y. 2011)...............................................11, 16, 21, 22

*Arden v. Columbia Pictures Indus., Inc.*,
   908 F. Supp. 1248 (S.D.N.Y. 1995)....................................................................16

*Ardis Health, LLC v. Nankivell*,
   2012 U.S. Dist. LEXIS 154839 (S.D.N.Y. Oct. 23, 2012) ...................................24

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..............................................................................................8

*Berrios v. N.Y. City Hous. Auth.*,
   564 F.3d 130 (2d Cir. 2009)..................................................................................9

*Bieg v. Hovnanian Enters., Inc.*,
   1999 U.S. Dist. LEXIS 1737 (E.D. Pa. Nov. 10, 1999)........................................10

*Blakeman v. Walt Disney Co.*,
   613 F. Supp. 2d 288 (E.D.N.Y. 2009) .............................................................12, 16

*Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*,
   373 F.3d 296 (2d Cir. 2004)................................................................................24

*Chivalry Film Prods. v. NBC Universal, Inc.*,
   2006 U.S. Dist. LEXIS 92956 (S.D.N.Y. Dec. 22, 2006) .....................................18

*Churchill v. Star Enters.*,
   183 F.3d 184 (3d Cir. 1999)................................................................................10

*Ciezkowska v. Gray Line New York*,
   295 F.3d 204 (2d Cir. 2002)..................................................................................9

ii

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*CK Co. v. Burger King Corp.*,
    1994 U.S. Dist. LEXIS 13934 (S.D.N.Y. Sept. 30, 1994)......................................................16

*Comp. Generated Sols., Inc. v. Koral*,
    1998 U.S. Dist. LEXIS 22801 (S.D.N.Y. Dec. 9, 1998) .....................................................25

*Davis v. ABC*,
    2010 U.S. Dist. LEXIS 76145 (W.D. Mich. July 28, 2010)................................................16

*Delor v. Fasano*,
    2006 U.S. Dist. LEXIS 31968 (W.D.N.Y. Apr. 30, 2006) ....................................................9

*DiTocco v. Riordan*,
    815 F. Supp. 2d 655 (S.D.N.Y. 2011)...........................................................................16, 22

*Excell v. City of N.Y.*,
    2012 U.S. Dist. LEXIS 93080 (E.D.N.Y. July 3, 2012).....................................................25

*Flaherty v. Filardi*,
    2009 U.S. Dist. LEXIS 22641 (S.D.N.Y. Mar. 20, 2009) ..............................................19, 23

*Funcia v. Nyse Group*,
    2007 U.S. Dist. LEXIS 88581 (S.D.N.Y. Nov. 29, 2007)..................................................9, 10

*Gal v. Viacom Int'l, Inc.*,
    518 F. Supp. 2d 526 (S.D.N.Y. 2007)...............................................................................12

*Gordon v. Invisible Children, Inc.*,
    2015 U.S. Dist. LEXIS 129047 (S.D.N.Y. Sept. 24, 2015)...............................................24

*Harper & Row, Publishers, Inc. v. Nation Enters.*,
    723 F.2d 195 (2d Cir. 1983).............................................................................................24

*Hilow v. Rome City Sch. Dist.*,
    2015 U.S. Dist. LEXIS 24562 (N.D.N.Y. Mar. 2, 2015).....................................................24

*Hoehling v. Universal City Studios, Inc.*,
    618 F.2d 972 (2d Cir. 1980).............................................................................................23

iii

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Hogan v. DC Comics,*
    48 F. Supp. 2d 298 (S.D.N.Y. 1999) .................................................................................16

*Irwin v. ZDF Enters.,*
    2006 U.S. Dist. LEXIS 6156 (S.D.N.Y. Feb. 16, 2006) .....................................................24

*Jackson v. Broad. Music, Inc.,*
    2006 U.S. Dist. LEXIS 3960 (S.D.N.Y. Jan. 31, 2006) .......................................................25

*Jones v. CBS, Inc.,*
    733 F. Supp. 748 (S.D.N.Y. 1990) ...................................................................................14

*Jorgensen v. Epic/Sony Records,*
    351 F.3d 46 (2d Cir. 2003) .........................................................................................11, 12

*Loomis v. Cornish,*
    2016 U.S. App. LEXIS 16261 (9th Cir. Sept. 2, 2016) ......................................................12

*Martinez v. McGraw,*
    2009 U.S. Dist. LEXIS 69862 (M.D. Tenn. Aug. 10, 2009) ...............................................13

*McRae v. Norton,*
    2012 U.S. Dist. LEXIS 52494 (E.D.N.Y. Apr. 13, 2012) .....................................................9

*Mena v. Fox Entm't Group,*
    2012 U.S. Dist. LEXIS 143964 (S.D.N.Y. Sept. 27, 2012) ............................................18, 21

*Meta-Film Assocs., Inc. v. MCA, Inc.,*
    586 F. Supp. 1346 (C.D. Cal. 1984) ................................................................................13

*Muller v. Twentieth Century Fox Film Corp.,*
    794 F. Supp. 2d 429 (S.D.N.Y. 2011) .........................................................................15, 18

*Myrieckes v. Woods,*
    2009 U.S. Dist. LEXIS 130188 (S.D.N.Y. Apr. 7, 2009) ....................................................18

*O'Diah v. New York City,*
    2002 U.S. Dist. LEXIS 15507 (S.D.N.Y. Aug. 21, 2002) ...................................................10

iv

**TABLE OF AUTHORITIES**
<u>(continued)</u>

<u>Page(s)</u>

*Oboler v Goldin*,
    714 F.2d 211 (2d Cir. 1983).........................................................................24

*Parks v. ABC, Inc.*,
    2008 U.S. Dist. LEXIS 5085 (S.D.N.Y. Jan. 24, 2008)........................................25

*Peter F. Gaito Arch., LLC v. Simone Dev. Corp.*,
    602 F.3d 57 (2d Cir. 2010)...............................................................8, 10, 11, 24

*REFCO Grp. Ltd., LLC v. Cantor Fitzgerald, L.P.*,
    2014 U.S. Dist. LEXIS 79708 (S.D.N.Y. June 10, 2014)........................................8

*Reyher v. Children's TV Workshop & Tuesday Publs.*,
    533 F.2d 87 (2d Cir. 1976).........................................................................20

*Robinson v. Viacom Int'l*,
    1995 U.S. Dist. LEXIS 9781 (S.D.N.Y. July 13, 1995) ...........................14, 16, 22

*Scott-Blanton v. Universal City Studios Prods. LLLP*,
    539 F. Supp. 2d 191 (D.D.C. 2008) ..............................................................22, 23

*Selby v. New Line Cinema Corp.*,
    96 F. Supp. 2d 1053 (C.D. Cal. 2000) .............................................................24

*Sheldon Abend Revocable Trust v. Spielberg*,
    748 F. Supp. 2d 200 (S.D.N.Y. 2010)...................................................14, 18, 21

*Thayil v. Fox Corp.*,
    2012 U.S. Dist. LEXIS 13669 (S.D.N.Y. Feb. 2, 2012)........................................8

*Tomasini v. Walt Disney Co.*,
    84 F. Supp. 2d 516 (S.D.N.Y. 2000)...........................................................12, 13

*Towler v. Sayles*,
    76 F.3d 579 (4th Cir. 1996) .......................................................................13

*Walker v. Time Life Films, Inc.*,
    784 F.2d 44 (2d Cir. 1986)...................................................................17, 20, 23

v

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Williams v. A&E TV Networks*,
 122 F. Supp. 3d 157, 163 (S.D.N.Y. 2015)........................................................................8, 24

*Williams v. Crichton*,
 84 F.3d 581 (2d Cir. 1996).................................................................................11, 15, 22, 23

*Woods v. Dunlop Tire Corp.*,
 1992 U.S. Dist. LEXIS 531 (W.D.N.Y. Jan. 13, 1992)............................................................10

*Zambito v. Paramount Pictures Corp.*,
 613 F. Supp. 1107 (E.D.N.Y. 1985)........................................................................................19

**STATUTES**

28 U.S.C. § 1915(e)(2)(B)..........................................................................................................2, 9

Copyright Act
 17 U.S.C. § 301..................................................................................................................24
 17 U.S.C. § 507(b)..............................................................................................................25

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 12(b)(6)......................................................................................8

vi

## I.    INTRODUCTION

Undeterred by this Court's 2007 judgment dismissing his first action against Showtime Networks Inc. ("Showtime") and Sony Pictures Television Inc. ("SPT," and with Showtime, "Movants"), Plaintiff Romanus Castro has now brought a second action based on the same frivolous allegations—that the television series *Huff* copied his 2003 screenplay titled "The Summit of Beauty and Love" ("*TSOBAL*").  Plaintiff's causes of action against Movants fail to state a claim for numerous, independent reasons, and should be dismissed (again) with prejudice.

*First*, Plaintiff's entire action against Movants is barred by *res judicata* because his prior action concerned the same events, and this Court's dismissal was a final judgment on the merits.

*Second*, Plaintiff cannot state a claim for copyright infringement.  Plaintiff's conjecture of access is based on an alleged tortuous chain of hypothetical transmittals that cannot constitute facts plausibly showing that Movants had reasonable access to his work.  Moreover, *Huff* and *TSOBAL* on their face are not similar—let alone, substantially similar—in protectible expression. Even at the most abstract, non-protectible level, the works are drastically different.  *TSOBAL* is "about a music journalist who falls in love with a musician who is schizophrenic" (FAC (Dkt. 8), ¶ 5), but *Huff* has no journalist or musician main character, nor is it a love story.  Plaintiff essentially complains that *Huff* has a schizophrenic character, but that idea is not copyrightable.

*Third*, Plaintiff's Second Cause of Action for conversion or conspiracy fails because it is preempted by the Copyright Act, and his request for punitive damages should be stricken.

*Fourth*, Plaintiff's causes of action against Showtime are barred by the three-year statute of limitations.  By Plaintiff's own allegations, Showtime's airing of *Huff* ended in 2006, and Plaintiff knew of his claims by that time, but did not file this action until 2015.

1

## II.    PROCEDURAL AND FACTUAL BACKGROUND

### A.    Judgment Dismissing Plaintiff's First Lawsuit Regarding *Huff*

As this Court has noted, "[o]n August 3, 2006, Castro filed an action which alleged that

the television series *Huff*, playing on the Showtime cable network, had striking similarities to his

screenplay and had, over the course of the series, utilized the entirety of his screenplay."  Dkt. 5,

p. 2; *see* Kim Decl., Exs. 1, 2.  In that action ("First Action"), filed *in forma pauperis*, Plaintiff

claimed that Showtime, SPT, and others infringed the copyright in his 2003 *TSOBAL* screenplay,

and "collu[ded] to defraud [him] of the right to his intellectual property for their personal gain."

Kim Decl., Ex. 2 at pp. 2, 10.  The Court dismissed the initial complaint for failure to allege a

valid registered copyright, but twice granted Plaintiff leave to amend, cautioning him both times

that if he failed to amend as directed, "the Court shall dismiss this complaint."  *Id.*, Exs. 3-4.

In October 2006, Plaintiff represented that he had "begun the process of receiving an

official copyright," and asked for an extension to file a second amended complaint until February

2007, by which time he could complete his registration.  Kim Decl., Ex. 5.  Plaintiff did not

amend, however, and on March 19, 2007, the Court entered judgment dismissing the First Action

for failure to state a claim under 28 U.S.C. § 1915(e)(2)(B).  *Id.*, Ex. 6.  In the present Action,

Plaintiff acknowledges he previously "attempted to take legal action to rectify the situation," and

alleges that "the financial and emotional toll it was taking proved too much."  FAC, ¶ 8.

### B.    Plaintiff's Allegations in This Action

Plaintiff alleges that he wrote *TSOBAL* in 2003 and that on an unspecified date in 2003,

he sent it to one person—Gaby Morgerman, the purported agent of John Cusack.  FAC, ¶ 5.

Plaintiff admits he "has yet to receive a response from any of the recipients."  *Id.*

Plaintiff alleges that *Huff* "premiered on the SHOWTIME Network on November 7,

2

2004" and, on that day, he "realized that [*Huff*] was indeed the same story he sent to John

Cusack." FAC, ¶¶ 42, 6.[1]  He alleges that the final *Huff* episode aired on June 26, 2006. *Id.*, ¶ 8.

Plaintiff claims that Showtime and SPT are producers of *Huff* and that defendant Bob Lowry was

the show's creator.  *Id.*, pp. 2-3.  Plaintiff does ***not*** claim that John Cusack produced or worked

on *Huff*, or had any direct relationship with Showtime, SPT, or Bob Lowry, relating to *Huff* or

otherwise.  Indeed, Plaintiff  admits he "was incredulous about how a script meant for John

Cusack in care of his agent ended up in the hands of a person by the name of **Bob Lowry**," who

was "represented by a different talent/literary agency." *Id.*, ¶ 7.  The FAC then makes various

conjectures about how *TSOBAL* possibly might have "passed many hands." *Id.*, ¶ 4.[2]

Plaintiff's First Cause of Action claims that defendants infringed his copyright.  FAC,

¶ 61.  His Second Cause of Action claims that defendants conspired with Cusack to convert

Plaintiff's rights and property in *TSOBAL*. *Id.*, ¶ 69.  The Third Cause of Action merely seeks

damages over $100 million and $150 million in punitive damages. *Id.*, ¶¶ 70-71.

### C.   *Huff* **Television Series**

*Huff* is a television show with two 13-episode seasons.  *See* FAC, Ex. C; Kim Decl., Exs.

7, 8 (DVDs of *Huff*).  The series explores the lives, family struggles, and psychological issues of

Los Angeles psychiatrist Dr. Craig "Huff" Huffstodt and the people in his life, including his

---

[1] Incredibly, Plaintiff claims that *three* very different television series—*Huff*, *DIRT*, and *Empire*—separately copied *TSOBAL*.  Plaintiff does not allege that Movants produced or aired either *DIRT* or *Empire*, and the FAC's minimal allegations about Movants pertain solely to *Huff*.

[2] Plaintiff alleges that some *Huff* cast and crew, or people related to them, knew or once worked with Cusack or his sister on projects unrelated to *Huff*.  FAC, ¶ 43.  Plaintiff also vaguely alleges that one *Huff* producer, 50 Cannon Entertainment, "shares proximity to Cusack's own ***NEW CRIME PRODUCTIONS***." *Id.*  Finally, Plaintiff claims that Cusack had a vested interest in *The Huffington Post*, and speculates that "naming the series HUFF was a calculated move- to create brand recognition for the **HUFFington Post** in advance of its launch." *Id.*, ¶ 42.

3

patients; his increasingly unhappy and hostile wife Beth; his sensitive teenage son Byrd; his institutionalized, schizophrenic brother Teddy; his alcoholic, borderline-depressed mother Izzy; and his best friend Russell Tupper, a morally challenged, sex-and-drug-addicted attorney.

**Season 1**.  In Episodes 1 through 3, Huff's relatively happy and stable life is upended when his patient Sam, who has been rejected by his parents after disclosing he is gay, shoots himself in front of Huff.  Huff tries to deal with his guilt, while fending off a medical-board investigation and wrongful-death lawsuit with Russell's help.  Huff also fails at helping, and tries to cut ties with, a violent bipolar patient named Melody.  Meanwhile, in Huff's personal life, Beth battles with Izzy for supremacy in the household, and Huff's seemingly innocent son Byrd is going to sex parties.  Izzy's closest friend Lois suffers an incapacitating stroke.  Russell has his television stolen by a prostitute named Pepper, and engages in a wild night of drugs and sex with Kelly, the clerk who sells him a new television.  Teddy is stuck in a mental institution and appears only at the end of each episode when Huff visits, often to vent about his own problems.

In Episodes 4 through 6, the wrongful-death suit continues, but is dropped after Sam's mother admits she knew he was suicidal.  Huff has his own issues with his estranged father Ben, who contacts him only to get Izzy to sign divorce papers.  Beth learns her mother, Madeleine, has found a lump in her breast.  Byrd begins tutoring Gail, with whom he later has sex.  Teddy escapes during an institution field trip, but Beth finds him at the old family home.  Teddy and Izzy have a heartfelt conversation, in which Izzy reveals her guilt over Teddy's mental illness.

In Episodes 7 through 11, the characters encounter more challenges in their lives and relationships.  Huff's father Ben tries but fails to make peace with Huff at the family cabin. Huff's former patient Melody breaks into his house and stabs Beth, and Beth begins emotionally

4

withdrawing from Huff.  Beth's entire family flies into town for Christmas, and Beth struggles with her mother's cancer and choice to forgo chemotherapy.  Huff kisses a young pharmaceutical representative and, out of guilt, accuses Beth's client of hitting on her.  Izzy, in an act of compassion, turns off her friend Lois's life support machine so she can die.  Russell overdoses on heroin and pays Pepper to help him detox, and the two narrowly avoid a bomb explosion that kills Russell's shady client.  Russell advises Izzy on her divorce, and they end up having sex. Russell learns from Kelly, the electronics-store clerk, that she is pregnant with his child.

In Episodes 12 through 13, the problems escalate.  Tensions between Huff and Beth reach a new high after Huff confesses his infidelity and Melody breaks into the house again.  Beth's mother moves in and her cancer worsens.  Teddy wants to take a new, possibly fatal medication, but Izzy vetoes it.  Huff arranges a meeting so that Teddy can have a say in his treatment.  When Izzy does not show up, Huff looks for her and discovers she and Russell have been sleeping together.  Huff and Russell fight, and in the ensuing chaos, Teddy escapes in Huff's car.

**Season 2**.  As Season 2 opens, Huff is stressed over Teddy's disappearance and is not speaking to Russell, Beth is distressed over her mother's imminent death, and Izzy is drinking heavily.  In Episodes 1 through 4, Teddy contacts Huff from Mexico, where he has gone to get the new medication.  Huff goes to find Teddy and is forced to ask Russell for help.  Teddy jumps off a balcony, but only breaks his wrist.  Back home, Huff reluctantly allows Teddy to move into an assisted-living facility that provides more freedom.  Madeleine's tumor miraculously shrinks, but Beth and Huff continue to struggle.  An ignored Byrd breaks into a house and is caught by a boy named James.  Russell gets involved with a new client with criminal and mental issues.

In Episodes 5 through 8, Huff meets Melody's new psychiatrist, Lena, who later becomes

5

a friend and therapist to Huff.  Lena conducts drug-induced therapy on Huff, and Huff and Beth

engage in couples' therapy, and the sessions uncover deeply-rooted resentment and unhappiness.

Huff's father Ben, who is on the run from thugs and needs to leave town, tries to patch things up

with Teddy and Izzy.  Russell misses an important deposition due to a drug bender.  Teddy finds

a job and falls for a woman named Alyssa, but his paranoid delusions intensify.

In Episodes 9 through 13, Huff and Beth separate, and Huff stays with Russell and ends

up having sex with a prostitute.  Russell tries to be more responsible by helping Kelly prepare to

give birth, but later parties with Pepper, who dies of an overdose in his home.  Beth and Izzy

grow closer over their shared experiences with Huffstodt men.  Byrd fights with Huff, and deals

with problems with James by tying and beating him up.  Teddy discloses his illness to Alyssa.  In

the finale, Russell is arrested and kicked out of his law firm, but helps Kelly deliver their baby.

Huff slaps Byrd in a heated argument, and Beth tells Huff she does not want him to come home.

Teddy tries to kill Alyssa and is hospitalized, but then shares a tender moment with Izzy.  The

show ends with Lena asking Huff how he is doing, and Huff answering that he has no idea.

### D.  <u>Plaintiff's Alleged Work, The Summit of Beauty and Love (*TSOBAL*)</u>

Plaintiff's alleged work, *TSOBAL*, is an 106-page screenplay.  FAC, Ex. A.  The story's

protagonist is Chase, a famous journalist at *Music Slate* magazine.  Chase starts off as a hardened

reporter who does not care if he destroys lives so long as he gets his story, but is transformed into

a caring person through his romantic relationship with the other main character, Jared.  Jared is a

musician who abuses illegal drugs and exhibits erratic behavior.  He is later revealed to have

schizophrenia, and with Chase's support, he finally chooses to accept medical treatment.

*TSOBAL* opens with Chase using a ruse to force Sheila, a top vocalist, to give him an

interview.  On his way into his office, Chase is accosted by but ignores a homeless man named

Charlie.  Chase's boss Sandra convinces him to do a story on Jared, an up-and-coming musician.

Chase's ex-boyfriend moves his belongings out of the apartment.  Chase hears Jared sing at a

club, is impressed, and leaves a note for him.  After a confrontation with another pop star, Chase

gets a message from Jared agreeing to meet.  The meeting goes horribly, with Jared calling

Chase a heartless reporter.  Jared visits his younger sister, without their mother knowing.  Then,

while walking on the street, Jared hears menacing voices and tries to run away.  He shows up

disheveled and bloody at Chase's apartment, saying that men assaulted him.  The two get to

know each other.  Sandra tells Chase to write the story on Jared.  FAC, Ex. A, pp. 1-38.

Jared snorts cocaine and hears voices again.  He goes to Chase's apartment, and ends up

staying over for a while.  Jared and Chase make love, and later start dating.  Jared takes Chase on

a spontaneous trip to Coney Island; while there, Jared hears voices and abandons Chase.  The

two make up and grow closer.  While Jared continues to act erratically, Chase convinces a record

label president to consider giving Jared a record deal if he performs at a showcase.  Jared agrees,

but Sandra, over Chase's objection, publishes the story Chase has been writing on Jared.  An

angry Jared indulges in drugs before the showcase.  Hearing voices, Jared attacks a showcase

guest causing a massive fight, and Jared is rushed to the hospital.  FAC, Ex. A, pp. 39-76.

Chase learns that Jared's behavior was not caused by drug use as he had thought, but by

untreated schizophrenia.  Chase tells Sandra, who brings up the homeless man Charlie.  Chase

looks for Charlie, but cannot find him.  Chase seeks out Jared's mother Joyce.  In explaining how

Jared ruined her life and why she will not visit him, Joyce tells Chase the backstory of Jared's

and his father's mental illness.  Jared's sister gives Chase a letter that Jared wrote her, talking

about how much he admires Chase.  Chase tells Jared that he loves him and urges Jared to accept

7

help, and Jared finally decides to take his medication.  FAC, Ex. A, pp. 76-94.

The story then jumps six months.  Chase is volunteering to teach children at a homeless shelter, and he also takes a leave of absence from his job.  Jared is seeing a psychiatrist; he explains to her that love made him want to get better.  Jared performs to a roaring crowd at Radio City Music Hall, and hears his song on the radio for the first time.  The final scene is again set in Coney Island, with Chase and Jared happily in love.  FAC, Ex. A, pp. 94-106.

### III.   FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6) STANDARD

A complaint must be dismissed under Rule 12(b)(6) where, accepting the well-pleaded *factual* allegations as true, it fails to "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A claim only has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  In ruling on a motion to dismiss in copyright infringement actions, courts properly consider the parties' respective works, which "supersede and control contrary descriptions of them, including any contrary allegations, conclusions or descriptions of the works contained in the pleadings."  *Peter F. Gaito Arch., LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (quotations and citations omitted); *e.g.*, *Williams v. A&E TV Networks*, 122 F. Supp. 3d 157, 163 (S.D.N.Y. 2015) (dismissing copyright infringement complaint with prejudice after reviewing plaintiff's treatment and defendant's 12-episode television series).  Courts may also judicially notice matters of public record such as "'the status of other lawsuits . . . and the substance of papers filed in those actions,'" *Thayil v. Fox Corp.*, 2012 U.S. Dist. LEXIS 13669, at *9 (S.D.N.Y. Feb. 2, 2012), and corporate relationships, *REFCO Grp. Ltd., LLC v. Cantor Fitzgerald, L.P.*, 2014 U.S. Dist. LEXIS 79708, at *45-47 n.16 (S.D.N.Y. June 10, 2014) (corporate relationships "are the proper subject of judicial notice").

8

## IV.   ARGUMENT

A.   __Plaintiff's Entire Action Against Movants Is Barred by__ *__Res Judicata__*

*Res judicata* bars an action if (1) "a final judgment" was "entered on the merits"; (2) the prior action involved "the same parties or those in privity with them"; and (3) the current action "concern[s] the transaction, or series of connected transactions, out of which the [prior] action arose." *Ciezkowska v. Gray Line New York*, 295 F.3d 204, 205 (2d Cir. 2002). "In the interest of judicial efficiency, res judicata can be raised and considered on a pretrial motion to dismiss." *Funcia v. Nyse Group*, 2007 U.S. Dist. LEXIS 88581, at *12 (S.D.N.Y. Nov. 29, 2007).

All three requirements are met here.  First, this Court's judgment dismissing Plaintiff's First Action for failure to state a claim was a final judgment on the merits.  *See Berrios v. N.Y. City Hous. Auth.*, 564 F.3d 130, 134-35 (2d Cir. 2009) ("[T]he dismissal for failure to state a claim is a final judgment on the merits and thus has res judicata effects."); *Ciezkowska*, 295 F.3d at 206 (second *in forma pauperis* action properly dismissed as claim-barred as it involved same events as the first action, dismissed for failure to state a claim under 28 U.S.C. § 1915(e)(2)(B)); *McRae v. Norton*, 2012 U.S. Dist. LEXIS 52494, at *8 (E.D.N.Y. Apr. 13, 2012) (same).

Second, the First Action involved the same parties here—Plaintiff, Showtime, and SPT.[3]

Third, the current action against Movants concerns the same events as the First Action. As here, Plaintiff's First Action alleged that both seasons of *Huff*, which aired from November 2004 to June 2006, copied *TSOBAL*.  *Compare* FAC, ¶¶ 5, 6, 8, *with* Kim Decl., Ex. 2 at pp. 2, 3;

---

[3] The Complaint in the First Action named SPT as the defendant, although the caption listed Sony Pictures Entertainment ("SPE").  Kim Decl., Ex. 1, p. 2.  Regardless, SPT is a subsidiary of SPE and thus is in privity with SPE for purposes of *res judicata*.  *See id.*, Ex. 9, p. 32; *see Delor v. Fasano*, 2006 U.S. Dist. LEXIS 31968, at *13 & n.2 (W.D.N.Y. Apr. 30, 2006) (on motion to dismiss, *res judicata* barred claims where SEC filing showed that current defendant was a subsidiary of original defendant), *aff'd*, 291 Fed. Appx. 366, 367 (2d Cir. Aug. 27, 2008).

*see* FAC, ¶ 53 (describing previous action).  Plaintiff's First Action even asserted the same

claims—copyright infringement and conspiracy to violate his rights in *TSOBAL.  Compare* FAC,

¶¶ 61, 69, *with* Kim Decl., Ex. 2 at pp. 2, 10.  That Plaintiff decided not to register *TSOBAL*

before suing in 2006 or during the seven months the First Action was pending, and opted not to

file a second amended complaint, does not exempt the Court's judgment from *res judicata.  See*

*O'Diah v. New York City*, 2002 U.S. Dist. LEXIS 15507, at *20-21 (S.D.N.Y. Aug. 21, 2002)

(dismissal was *res judicata* where plaintiff had opportunity to amend but failed to do so).[4]

     Plaintiff's claims against Movants should be dismissed for this reason alone.  *See Funcia*,

2007 U.S. Dist. LEXIS 8851, at *13-14 (amendment futile if claims barred by *res judicata*).

  **B.**    <u>**Plaintiff Cannot State a Claim for Copyright Infringement as a Matter of Law**</u>

     Plaintiff's claims also fail on their merits.  To establish copyright infringement, Plaintiff

must demonstrate that "'(1) the defendant has actually copied the plaintiff's work; and (2) the

copying is illegal because a substantial similarity exists between the defendant's work and the

protectible elements of plaintiff's.'"  *Peter F. Gaito*, 602 F.3d at 63.  For "actual copying," a

plaintiff may show that "'the person who composed the defendant's work had access to the

---

[4] *See Bieg v. Hovnanian Enters., Inc*., 1999 U.S. Dist. LEXIS 1737, at *11-12 (E.D. Pa. Nov. 10, 1999) (rejecting argument that plaintiff could not have asserted his copyright claims in first action because he had not yet secured registrations; "The question, however, is not when plaintiff pursued a right but when the right arose.  It appears that defendant was allegedly copying and distributing plaintiff's work for some period before the prior action was litigated and that he had actual knowledge of this almost three months before the dismissal of that action. . . . [A] plaintiff cannot sit on his rights. . . . Plaintiff waited for at least four years after creating his works before making any attempt to register them." (citations omitted)).  *Accord Churchill v. Star Enters.*, 183 F.3d 184, 191 (3d Cir. 1999) (ADA claim barred by *res judicata* where plaintiff "sat on her rights" by failing to request EEOC right-to-sue letter before termination of prior case); *Woods v. Dunlop Tire Corp.*, 1992 U.S. Dist. LEXIS 531, at *8-9 (W.D.N.Y. Jan. 13, 1992) (same).  Plaintiff's registration certificate (FAC, Ex. B) has an effective date of June 19, 2015—***twelve years*** after he allegedly wrote *TSOBAL* and more than ***eight years*** after he represented to this Court that he was in the process of obtaining a registration (Kim Decl., Ex. 6).

copyrighted material'" and "that there are similarities between the two works that are 'probative

of copying.'" *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003) (citation omitted).

Even if actual copying can be established, however, there can be no infringement unless

"'it is *protected* expression in the earlier work that was copied *and* the amount that was copied is

*more than de minimis*.'" *Allen v. Scholastic Inc.*, 739 F. Supp. 2d 642, 654 (S.D.N.Y. 2011)

(emphases added).   "'The standard test for substantial similarity between two items is whether an

"ordinary observer," unless he set out to detect the disparities, would be disposed to overlook

them, and regard [the] aesthetic appeal as the same.'" *Peter F. Gaito*, 602 F.3d at 66.   But

where, as here, the defendant's work contains both protectible and unprotectible elements, the

"ordinary observer" test becomes "more discerning" and requires the court to "attempt to extract

the unprotectible elements from [its] consideration and ask whether the protectible elements,

standing alone, are substantially similar." *Id.* (quotations omitted).   It is fundamental that "'a

copyright does not protect an idea, but only the expression of an idea.'" *Williams v. Crichton*,

84 F.3d 581, 587 (2d Cir. 1996).   "Similarly, scenes a faire, sequences of events that 'necessarily

result from the choice of a setting or situation,' do not enjoy copyright protection." *Id.*   In

comparing the two works, the court should "examine the similarities in such aspects as the total

concept and feel, theme, characters, plot, sequence, pace, and setting . . . ." *Id.* at 588.

"[I]t is entirely appropriate for a district court to resolve [the] question [of substantial

similarity] as a matter of law, 'either because the similarity between two works concerns only

non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly

instructed, could find that the two works are substantially similar.'" *Peter F. Gaito*, 602 F.3d at

63.   Accordingly, "many courts have, after comparing the works at issue, dismissed infringement

11

claims for failure to state a claim where substantial similarity between the works cannot be found." *Blakeman v. Walt Disney Co.*, 613 F. Supp. 2d 288, 298 (E.D.N.Y. 2009) (citing cases).

### 1. Plaintiff Fails to Plausibly Allege Access by Movants to *TSOBAL*

Plaintiff fails to plausibly allege the first prong for actual copying—access by Movants to *TSOBAL*. "Access means that an alleged infringer had a 'reasonable possibility' – not simply a 'bare possibility' – of [viewing] the prior work; access cannot be based on mere 'speculation or conjecture.'" *Jorgensen*, 351 F.3d at 51.[5] Plaintiff alleges he sent *TSOBAL* to a single person, Gaby Morgerman, and admits she never responded and did not represent Lowry. FAC, ¶¶ 5, 7, 66. Despite numerous attempts to plead a claim for nearly a decade, Plaintiff fails to allege any close relationship between Morgerman and Lowry, Showtime, or SPT in 2003-2004, much less one involving *Huff.* Access by a purported infringer through a third-party intermediary who received the plaintiff's work may only be inferred if the intermediary "has a *close relationship* with the infringer" involving an overlap in subject matter, such as someone who "supervises or works in the same department as the infringer or contributes creative ideas to him." *Jorgensen*, 351 F.3d at 53 (quoting *Towler v. Sayles*, 76 F.3d 579, 583 (4th Cir. 1996)); *see Loomis v. Cornish*, 2016 U.S. App. LEXIS 16261, at *5 (9th Cir. Sept. 2, 2016) ("'dealings between the plaintiff and the intermediary and between the intermediary and the alleged copier must involve some overlap in subject matter to permit an inference of access'"). The conclusion would not change even if Plaintiff had actually sent *TSOBAL* to John Cusack. Nowhere does Plaintiff

---

[5] To establish access, a plaintiff may show "'(1) the infringed work has been widely disseminated or (2) a particular chain of events exists by which the defendant might have gained access to the work.'" *Tomasini v. Walt Disney Co.*, 84 F. Supp. 2d 516, 519 (S.D.N.Y. 2000). Plaintiff cannot allege widespread dissemination because *TSOBAL* was unpublished. FAC, Ex. B (PAu registration for unpublished work in 2015); *Gal v. Viacom Int'l, Inc.*, 518 F. Supp. 2d 526, 538 (S.D.N.Y. 2007) (an unpublished work "is considered not to have been widely disseminated").

allege that Cusack was working at Showtime or SPT, or for Lowry, or that Cusack was contributing ideas to any of them on any project at the time, much less on *Huff*.

Plaintiff's access theory amounts to nothing more than speculation of a "bare possibility" of access, premised on a "tortuous chain of hypothetical transmittals." *Meta-Film Assocs., Inc. v. MCA, Inc.*, 586 F. Supp. 1346, 1355 (C.D. Cal. 1984). Plaintiff's conjecture is based solely on alleged "associations" between Cusack and *Huff* actors or crew on past unrelated projects, a nebulous "proximity" between companies, and a conspiracy theory relating to *The Huffington Post.* FAC, ¶¶ 7, 42, 43. But "[a]n inference of access based on a third party's possession of the plaintiff's work requires more than a mere allegation that someone known to the defendant possessed the work in question." *Tomasini*, 84 F. Supp. 2d at 522 (quotations omitted). And "it is clearly unreasonable to attribute the knowledge of any one individual -- especially a non-employee -- to every other individual just because they occupy offices on the same studio lot." *Meta-Film*, 586 F. Supp. at 1357-58. Otherwise, any plaintiff who mails his work, unsolicited, to an agent or actor could establish access to nearly anyone in the entertainment industry, simply through a game of "six degrees of separation." Courts have soundly rejected such attempts.[6] Plaintiff's failure to plausibly allege access alone compels dismissal of his claims.

## 2.   *Huff* and *TSOBAL* Are Not Substantially Similar as a Matter of Law

Plaintiff's claims fail for the independent reason that, as a comparison of the works plainly shows, *Huff* and *TSOBAL* are not similar—let alone, substantially similar—in characters,

---

[6] *See Towler*, 76 F.3d at 583 (access cannot be inferred from defendant's "prominence in the film industry" or defendant's prior work with alleged intermediaries on unrelated projects); *Martinez v. McGraw*, 2009 U.S. Dist. LEXIS 69862, at *13-16 (M.D. Tenn. Aug. 10, 2009) (granting motion to dismiss, where access theory was premised on "speculat[ion] that because [the alleged third-party intermediary] and [defendant] recorded their albums at the same studio and shared musical personnel to produce their albums, Defendants had access to Plaintiff's song").

13

plot, sequence, setting, pace, dialogue, themes, or total concept and feel.

**Characters**.  "Copyright law provides very limited protection to the characters," and "[b]asic character types are not copyrightable." *Jones v. CBS, Inc.*, 733 F. Supp. 748, 753 (S.D.N.Y. 1990).  "The bar for substantial similarity in a character is set quite high." *Sheldon Abend Revocable Trust v. Spielberg*, 748 F. Supp. 2d 200, 208 (S.D.N.Y. 2010).  "In comparing the characters of two works, a court must consider the 'totality of their attributes and traits.'" *Robinson v. Viacom Int'l*, 1995 U.S. Dist. LEXIS 9781, at *25 (S.D.N.Y. July 13, 1995) (quoting *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986)).

The characters in the two works are extraordinarily different.  Plaintiff claims that *Huff*'s Dr. Craig Huffstodt (as well as characters in *DIRT* and *Empire*) is similar to *TSOBAL*'s Chase Anderson (FAC, ¶ 12), but the two are nothing alike, even in general idea.  Huff is a middle-aged, heterosexual, Caucasian psychiatrist with a wife, son, mother, brother, and best friend, and these basic traits—his psychiatrist profession and family—are crucial to his storyline.  Huff is Teddy's older brother, not his lover.  Huff feels the need to be "Mr. Nice Guy," to take care of everyone, and to mediate conflicts between his family members.  However, over the course of the series, Huff begins focusing more on his own happiness and clashes with his loved ones.

By contrast, Chase is gay and single, which is important for his romance with Jared.  His age and race are unknown.  He starts off with no loved ones, and his family is never mentioned.  His profession as a music journalist is a key trait.  *See* FAC, ¶ 10.  Chase's personality is starkly different from Huff's, and his story arc goes in the opposite direction:  Chase begins a self-centered, callous person, but learns to care about others through his relationship with Jared.

Plaintiff's claim that *Huff*'s Teddy is similar to *TSOBAL*'s Jared fares no better.  *See*

14

Appendix A (No. 6).[7]  Beyond the unprotectible trait of schizophrenia and *scenes of faire* resulting from that situation, the two are not similar at all, and "many differences emerge, including the motivations for the characters . . . , the skills and credentials of the characters, and their interpersonal relationships." *Crichton*, 84 F.3d at 589.  Teddy is just one of many main characters.  He is Huff's younger brother, not lover, and Teddy's evolving relationship with his guilt-ridden mother is a recurring storyline.  For most of Season 1, Teddy is confined to a mental institution, where he has been for ten years after strangling his mother in a psychotic episode. Having spent his adulthood in the institution, Teddy has no profession nor does he self-medicate with illegal drugs.  He is eager to try to new treatments, escaping to Mexico to find a prescription drug.  Teddy's actions are largely motivated by his desire to be autonomous.  Although he gains more freedom in the assisted-living facility, he does not adjust well and tries to kill his girlfriend.

Jared is fundamentally different.  He is one of two central characters.  *See* FAC, ¶ 13 (alleging that "Jared's story is the centerpiece of TSOBAL").  Jared is Chase's subject for a story and later becomes his lover.  He has no interactions with his mother, who blames him for ruining her relationships.  Fundamental to his character and storyline is that he is a talented musician who lives without supervision, has long ago stopped taking medication to be "normal," and tries to mask symptoms with illegal drugs.  Jared's development is the exact opposite of Teddy's: Jared starts as completely independent and off his medication, but finally accepts treatment.[8]

---

[7] Appendix A hereto addresses Plaintiff's list of random alleged similarities in Exhibit C to the FAC.  For ease of reference, Appendix A assigns numbers to Plaintiff's alleged similarities.

[8] Courts have found far more similar characters *not* to be substantially similar.  *E.g.*, *Muller v. Twentieth Century Fox Film Corp.*, 794 F. Supp. 2d 429, 446 (S.D.N.Y. 2011) (both works had characters who "both serve as the team expert, escape an underground pyramid, and survive an expedition to the Antarctic," and characters who "both are initially frozen in ice but then reanimate, are leaders, and are eventually slain"), *aff'd sub nom. Muller v. Anderson*, 84 Fed.

15

Plaintiff ignores *Huff*'s other main characters, including Beth, Byrd, and Russell, and the absence of any alleged counterparts in *TSOBAL* significantly differentiates the works. *See Blakeman*, 613 F. Supp. 2d at 307-08 (noting absence of counterparts for critical characters). Moreover, although Plaintiff alleges similarity to undeveloped stock characters in *TSOBAL*, such characters are not protected by copyright, and in any event, his alleged similarities only go to their rudimentary character type. *See Robinson*, 1995 U.S. Dist. LEXIS 9781, at *24 ("'No character infringement claim can succeed unless plaintiff's original conception sufficiently developed the character, and defendants have copied this development and not merely the broader outlines.'"). Plaintiff likens a *Huff* character named Istvan Nihaly to *TSOBAL*'s Charlie (FAC, ¶ 23), but beyond the general sketch of a homeless man, they share no similarity. Istvan is an imaginary figment of Huff's psyche and manifests as a Hungarian musician. Istvan recurs throughout the show to comfort and give insight to Huff. By contrast, Charlie makes three brief appearances, each limited to trying to sell Chase pencils and being rebuffed. Appendix A (Nos. 1, 4, 5, 8, 17). Plaintiff alleges that other characters are alike because they are "assistants" or are named "James," but such superficialities are unprotectible.[9] *Id.* (Nos. 7, 9, 22, 23, 29, 34, 37).

---

Appx. 81, 84 (2d Cir. Nov. 8, 2008); *Allen*, 739 F. Supp. 2d at 659-61 ("famous male wizards, initiated late into wizarding (in pre-/early adolescence), who receive formal education in wizardry, and are chosen to compete in year-long wizard competitions"); *Hogan v. DC Comics*, 48 F. Supp. 2d 298, 311 (S.D.N.Y. 1999) (two half-vampires both named Nicholas Gaunt who experience flashbacks as part of their discovery of their origins and become killers); *Arden v. Columbia Pictures Indus., Inc.*, 908 F. Supp. 1248, 1260-61 (S.D.N.Y. 1995) (two self-centered bachelors in their thirties who became trapped in a repeating day while pursuing love).

[9] *DiTocco v. Riordan*, 815 F. Supp. 2d 655, 668 (S.D.N.Y. 2011) (blond, popular, athletic girls unprotectible), *aff'd*, 496 Fed. Appx. 126 (2d Cir. Sept. 13, 2012); *Davis v. ABC*, 2010 U.S. Dist. LEXIS 76145, at *27 (W.D. Mich. July 28, 2010) (a name is generally unprotectible). *Cf. CK Co. v. Burger King Corp.*, 1994 U.S. Dist. LEXIS 13934, at *22 (S.D.N.Y. Sept. 30, 1994) ("The fact that characters have identical names and have similar roles in two works does not necessitate a finding of substantial similarity."), *aff'd*, 122 F.3d 1055 (2d Cir. 1995).

16

**Plot.**  In comparing works, courts look beyond the general plot, as "all fictional plots, when abstracted to a sufficient level of generalization, can be described as similar to other plots." *Alexander v. Murdoch*, 2011 U.S. Dist. LEXIS 79543, at *20-21 (S.D.N.Y. May 27, 2011), *aff'd*, 502 Fed. Appx. 107, 109 (2d Cir. 2012).  Even if the works "tell the same story" at "the most general level," they are not substantially similar if, "in moving to the next level of specificity, differences in plot and structure far outweigh th[e] general likeness."  *Walker*, 784 F.2d at 49.

Huff and *TSOBAL* tell very different stories, even at the most abstract level.  *Huff* covers a number of plots and subplots over its 26 episodes.  Dr. Huff's storyline largely focuses on his attempts to help his patients, parents, and brother, and the growing problems in his relationships with his wife and son.  Teddy's storyline is driven by his desire to control his own life, and moves from his confinement in an institution, to more freedom but also volatility at the assisted-living facility.  Izzy struggles to deal with her best friend's stroke, divorce from her husband, and guilt over Teddy's condition.  Beth becomes unglued by her mother's cancer and grows apart from Huff.  Byrd navigates his teenage years mostly on his own, with his parents preoccupied with their own problems.  Russell's hard-partying ways lead to a person's death, loss of his law firm job, and a baby from a one-night stand.  *Huff* ends with no resolution to these storylines.

By contrast, *TSOBAL* has a singular plot following the course of the romantic relationship between Chase and Jared, and no other characters experience any significant development.  As Plaintiff describes the story, "Chase is instantly intrigued by the mercurial Jared and soon they form an unlikely relationship.  But Jared is hiding a secret that becomes the focus of the story."  FAC, ¶ 10.  And as Plaintiff states, "[a] major plot point . . . is that Jared has stopped taking his medication for his mental condition" (*id.*, ¶ 30), and "taking drugs to mask the condition of his

17

schizophrenia" is "[t]he center of Jared's story" (*id.*, Ex. C, p. 15). These plot points lead to

Jared's psychotic episode at the showcase, which leads to the big reveal of his secret. This leads

to Jared, with Chase's love, accepting medication and "on his way to recovery." FAC, Ex. A, p.

94. This is entirely different from subplot of Teddy in *Huff*, in which his schizophrenia is known

and treated from the start, and despite taking medication, he never "recovers." *See Muller*,

794 F. Supp. 2d at 445 (no similarity where one work "involves a romance . . . and has a

definitive ending, with the 'good guys' triumphing," whereas the other "is devoid of romance,

and ends in a cliffhanger").[10] Because the works are so radically different, Plaintiff is reduced to

claiming that the *differences* somehow show that *Huff* and *TSOBAL* are similar. *E.g.*, FAC, ¶ 16

("Like [*Huff*] before it, the characters meant to be lovers are now related."); ¶ 20 ("This twist of

giving lines and action meant for others was used often by the defendants in [*Huff*] . . . ."). This

nonsensical claim only confirms the substantial disparity between the works.[11]

**Sequence.** The works' sequences of events are not remotely similar. *Huff* has no central,

linear story, but proceeds in an episodic fashion, presenting new problems with each episode and

following multiple characters through their respective storylines. *Huff* also uses a narrative

---

[10] Far more similar plots have been held to lack substantial similarity. *Spielberg*, 748 F. Supp. at 208 (both stories "of a male protagonist, confined to his home, who spies on neighbors to stave off boredom and, in so doing, discovers that one of his neighbors is a murderer, . . . is himself discovered by the suspected murderer, is attacked by the murderer, and is ultimately vindicated"); *Myrieckes v. Woods*, 2009 U.S. Dist. LEXIS 130188, at *27-28 (S.D.N.Y. Apr. 7, 2009) (both works involved "premise that the FBI assigns a female undercover agent to target a male drug kingpin" and "a romantic relationship between the drug dealer and the agent").

[11] *See Mena v. Fox Entm't Group*, 2012 U.S. Dist. LEXIS 143464, at *41-42 (S.D.N.Y. Sept. 27, 2012) (rejecting argument that defendant infringed by transferring certain traits to another character); *Chivalry Film Prods. v. NBC Universal, Inc.*, 2006 U.S. Dist. LEXIS 92956, at *7-8 (S.D.N.Y. Dec. 22, 2006) (rejecting claim that defendants revised screenplay to conceal copying, as "'a defendant may legitimately avoid infringement by intentionally making sufficient changes in a work which would otherwise be regarded as substantially similar to that of the plaintiff's'").

framing device for many episodes, wherein the episode begins with Huff in his office listening to his patients talk about their problems, and ends with Huff confiding to Teddy about his own problems.  This is in stark contrast to *TSOBAL*'s linear sequence.  *TSOBAL* introduces Chase and Jared, develops their relationship, climaxes with Jared's public psychotic break, reveals his schizophrenia, and neatly ends with the two happy and embarking on their new life together.

**Setting**.  The works' settings are extremely different.  *Huff* is set in the Los Angeles area and briefly in Mexico.  The scenes primarily take place in Huff's upscale suburban house and doctor's office, Teddy's institution and assisted-living residence, and Russell's law firm.  By contrast, *TSOBAL* is primarily set in or around New York City, with prominent scenes in Chase's apartment, his magazine's office, nightclubs, Coney Island, and Jared's mother's home.  And, as Plaintiff emphasizes, *TSOBAL* is "set in the world of music," whereas *Huff* is not.  Appendix A (No. 33).  *See Zambito v. Paramount Pictures Corp.*, 613 F. Supp. 1107, 1111 (E.D.N.Y. 1985) (no substantial similarity where one work was set in a Peruvian jungle, and the other began briefly in a South-American jungle but took place mostly in Cairo).

**Pace**.  The works also differ significantly in pace.  After introducing Chase and Jared, *TSOBAL* charts the progression of their relationship, moving directly from one development to the next.  It employs large time jumps, including a six-month jump at the end.  FAC, Ex. A, p. 95.  In contrast, *Huff* follows, and explores in great depth, the day-to-day lives of the characters, with each episode generally covering a few days.  Each episode covers multiple subplots, and jumps around among the multiple characters' storylines.  *See Flaherty v. Filardi*, 2009 U.S. Dist. LEXIS 22641, at *23-24, 52 (S.D.N.Y. Mar. 20, 2009) (no similarity where defendant's work "incorporates more subplots and jumps around more, moving quickly from scenes in the main

plot to those in the subplot and shifting frequently between different physical perspectives," whereas plaintiff's works "focus on the one main plot and unfold in a more linear fashion").

**Dialogue**.  Out of the 23 hours of *Huff* episodes, Plaintiff alleges that a few conversations were derived from his screenplay.  In fact, there is no similarity in dialogue besides a single word or non-copyrightable common phrase.  *See Alexander v. Haley*, 460 F. Supp. 40, 46 (S.D.N.Y. 1978) ("Words and metaphors are not subject to copyright protection; nor are phrases and expressions conveying an idea that can only be, or is typically, expressed in a limited number of stereotyped fashions.").  For example, Plaintiff claims that a conversation from *Huff* in which Teddy talks about the voices he hears was "lifted virtually unchanged from [*TSOBAL*]." Appendix A (No. 10).  In reality, besides the word "tired," the dialogue is completely different.  Plaintiff's remaining allegations are likewise specious.  *See id.* (Nos. 12, 16, 34, 45, 55, 59, 61).

**Themes**.  *TSOBAL*'s central theme is "love conquers all."  As Chase tells Jared, "I love you . . . If this thin[g], this illness is part of the deal then we can overcome it together . . . ." FAC, Ex. A, p. 92.  This, however, is a common theme of romantic dramas, and copyright does not extend to "'stock' themes commonly linked to a particular genre."  *Walker*, 784 F.2d at 50.

In *Huff*, love does *not* conquer all, as shown in the final episode in which Teddy tries to kill his new love interest.  *Huff*'s many episodes have multiple themes, but one broad theme is that everybody suffers from their own mental "illnesses."  This theme is punctuated by Teddy and Huff's patients, but carries through to the "sane" characters, including Huff, the psychiatrist. *Huff* is also centered on the family dynamic, and explores the tensions and changes in the intersecting family relationships.  These themes do not appear in *TSOBAL*, which involves only one mentally ill character, whose relationship with family does not evolve.  *Cf. Reyher v.*

20

*Children's TV Workshop & Tuesday Publs.*, 533 F.2d 87, 92 (2d Cir. 1976) (no substantial similarity despite shared "thematic concept that to a lost child, the familiar face of the mother is the most beautiful face, even though the mother is not, in fact, beautiful to most").

**Total Concept and Feel**.  The works are hugely different in total concept and feel.  As a threshold matter, the substantial difference in length and content between *Huff*, a 26-episode series, and *TSOBAL*, a 106-page screenplay, "immediately undermines [any] suggestion that the authors similarly 'selected, coordinated and arranged the elements' of their work."  *Allen*, 739 F. Supp. 2d at 657.  *Huff* is far more complex, with each episode introducing new subplots, conflicts, and characters, whereas *TSOBAL* has a feature-length film format and presents a straightforward narrative with a central problem and resolution.  *See Mena*, 2012 U.S. Dist. LEXIS 143964, at *44 (different "total concept and feel" where one work "is written as a feature-length film, standalone and self-contained," and the other "is clearly structured as a serial program intended to proceed in an episodic fashion"); *Spielberg*, 748 F. Supp. 2d at 210 (different "total concept and feel" where one "is rife with subplots, [while the other] has none").

Review of the works "unequivocally confirms that they are distinctly different in both substance and style, and ultimately engender very different visceral responses from their [audience]."  *Allen*, 739 F. Supp. 2d at 657.  *TSOBAL* is a romantic, hopeful, and ultimately "feel good" love story.  *See* FAC, ¶ 5.  Every character and event exist to provide context for the eventual love between Chase and Jared—the catalyst for Jared's breakthrough and Chase's transformation.  *Huff*, on the other hand, is not a romantic love story.  It is a much more despondent, sardonic, and often sexually graphic series that deeply explores the various problems of numerous characters.  Whereas *TSOBAL*'s characters are dramatically changed for the better,

21

*Huff* depicts the devolution of its characters' lives, none of whom is securely given a happy

ending.  *See DiTocco*, 815 F. Supp. 2d at 672 (no substantial similarity where plaintiffs' books

"each conclude on a feel-good note" whereas defendants' books "each finish with a sense of

foreboding"); *Scott-Blanton v. Universal City Studios Prods. LLLP*, 539 F. Supp. 2d 191, 203-04

(D.D.C. 2008) (no substantial similarity between works involving a marriage collapsing due to

husband's homosexual affair; one work was generally optimistic and the other was morose).

**List of Random Alleged Similarities**.  Because the works as a whole are not

substantially similar, Plaintiff attempts to concoct similarity by listing abstractions of isolated,

trivial elements taken completely out of context.  *See* FAC, Ex. C.  Such lists, however, are

"'inherently subjective and unreliable,'" particularly where, as here, "'the list emphasizes

random similarities scattered throughout the works.'"  *Crichton*, 84 F.3d at 590.  Simply put,

"[s]uch a scattershot approach cannot support a finding of substantial similarity because it fails to

address the underlying issue: whether a lay observer would consider the works as a whole

substantially similar to one another."  *Id.*  Moreover, Plaintiff's allegations concern "superficial

and *de minimis* details" that could not support a substantial similarity finding even if they were

literally identical, which they clearly are not.  *Alexander*, 502 Fed. Appx. at 109.[12]

Even if substantially similar scattershot trivialities between two works could overcome

the completely different substance of the works (which they cannot), here, Plaintiff blatantly

mischaracterizes the works or employs abstractions and vagueness to mask the fact that the

---

[12] *See Allen*, 739 F. Supp. 2d at 663 (various trivial similarities such as competitions that "are scored out of one thousand units, are announced in the great hall of a castle, involve the rescue of hostages, and are the subject of bathtime ruminations" insufficient for substantial similarity); *Robinson*, 1995 U.S. Dist. LEXIS 9781, at *23-24 ("highlighting of similarities chosen from a number of episodes 'would seem as a general matter to allow a plaintiff to cast too wide a net'").

22

scenes he claims are similar are "quite dissimilar once examined in any detail." *Crichton*, 84

F.3d at 590.  *See* Appendix A.  At best, Plaintiff's list alleges similarity as to unprotectible ideas

and *scenes a faire*.  Plaintiff, for instance, likens a young patient killing himself in *Huff* to a rock

musician jumping out of a window in *TSOBAL*.  However, beyond the general idea of suicide, no

similarity exists.  Huff's patient Sam Johnson shoots himself in front of Huff, and this tragedy

threatens Huff's profession and his sanity and is a major plot point over several episodes.  In

*TSOBAL*, the rock star's suicide does not happen in real-time, is mentioned only once, and it has

no emotional impact on Chase, who jokes about it.  Appendix A (No. 2).[13]  Plaintiff also alleges

similarity as to symptoms of schizophrenia, such as being tormented by voices, having suicidal

thoughts, or feeling tired (No. 10), but such elements are unprotectible "incidents, characters or

settings which are as a practical matter indispensable, or at least standard, in the treatment of"

schizophrenia.  *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 979 (2d Cir. 1980).[14]

     In sum, any alleged "similarity between two works concerns only non-copyrightable

---

[13] Plaintiff's other alleged similarities, at most, concern generic ideas—a messy apartment (No. 11), being naked (No. 19), climbing through a window (No. 26), falling down stairs (No. 28), disappearing (No. 31), being barefoot (No. 33), violent encounters (Nos. 39, 49, 56), hiding behind a plant (No. 41), drug-fueled sex (No. 44), sex between two males (No. 44), a crying baby (No. 46), two people meeting (No. 50), putting one's head on a lover's shoulder (No. 50), topless women of different races (No. 51), an envelope with money or a letter (Nos. 53, 54), volunteering to help children (No. 58), and talking to a hotel employee (No. 60).  *See Walker*, 784 F.2d at 50-51 (person being thrown off a roof unprotectible); *Scott-Blanton*, 539 F. Supp. 2d at 202 ("having sex in an alley with a member of the same sex cannot be copyrighted").

[14] Likewise, a schizophrenic having delusions, becoming disheveled or attacking others in a psychotic episode, being restrained or institutionalized, or being estranged from his mother at different points in the stories (Nos. 6, 15, 24, 30, 62), wanting to stop taking medication (No. 21), writing nonsensical things (Nos. 40, 42), talking to a female therapist about progress (No. 47), and concealing the illness or having it accepted by others (Nos. 52, 55, 57) are factually-based, common *scenes a faire*.  Also, a microcassette recorder is *scenes of faire* of journalists or psychiatrists (Nos. 14, 48).  *See Flaherty*, 2009 U.S. Dist. LEXIS 22641, at *53-54 ("undercover activity by the lawyer protagonist, the prisoner's belief of innocence, the protagonist lying to the police, and the prisoner's appearance at the protagonist's home" are unprotected *scenes a faire*).

23

elements," and no reasonable jury "could find that the two works are substantially similar."
*Peter F. Gaito*, 602 F.3d at 63.  Plaintiff's complaint against Movants should be dismissed with
prejudice because lack of substantial similarity is a defect "not susceptible to cure," as the works'
contents cannot be altered by allegations.  *Gordon v. Invisible Children, Inc.*, 2015 U.S. Dist.
LEXIS 129047, at *33 (S.D.N.Y. Sept. 24, 2015); *e.g.*, *Williams*, 122 F. Supp. 3d at 161.

C.    **Plaintiff's Second Cause of Action Is Preempted by the Copyright Act**

  Plaintiff's Second Cause of Action alleges that defendants "conspired" with Cusack "to
convert the plaintiff's rights and property to their own use and profit, and to despoil and deprive
the plaintiff of his rights and property."  FAC, ¶ 69.  This claim is preempted by the Copyright
Act, 17 U.S.C. § 301, which precludes a common law claim where, as here, the plaintiff's work
falls within the types of copyrightable works, and the claim seeks to "vindicate legal or equitable
rights . . . equivalent to" copyright.  *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d
296, 305 (2d Cir. 2004); *see Selby v. New Line Cinema Corp.*, 96 F. Supp. 2d 1053, 1058 (C.D.
Cal. 2000) (screenplay is copyrightable work).  Indeed, it is well-established that conversion
claims are preempted.  *Harper & Row, Publishers, Inc. v. Nation Enters.*, 723 F.2d 195, 200-01
(2d Cir. 1983), *rev'd on other grounds*, 471 U.S. 539 (1985); *Ardis Health, LLC v. Nankivell*,
2012 U.S. Dist. LEXIS 154839, at *27 (S.D.N.Y. Oct. 23, 2012) (collecting cases).

  As the underlying tort of conversion is preempted, "no claim for civil conspiracy can
exist."  *Hilow v. Rome City Sch. Dist.*, 2015 U.S. Dist. LEXIS 24562, at *39 (N.D.N.Y. Mar. 2,
2015).  In any event, claims for conspiracy to convert rights protected by copyright are likewise
"preempted by federal copyright law."  *Irwin v. ZDF Enters.*, 2006 U.S. Dist. LEXIS 6156, at
*8-14 (S.D.N.Y. Feb. 16, 2006).  Finally, because "punitive damages are not available under the
Copyright Act of 1976," *Oboler v Goldin*, 714 F.2d 211, 213 (2d Cir. 1983), Plaintiff's punitive

24

damages demand (FAC, ¶ 71) must be stricken.  *See Comp. Generated Sols., Inc. v. Koral*, 1998 U.S. Dist. LEXIS 22801, at *17 (S.D.N.Y. Dec. 9, 1998) (striking punitive damages claim).

**D.    All of Plaintiff's Causes of Action Against Showtime Are Time-Barred**

In addition to the above reasons, all of Plaintiff's causes of action against Showtime fail because they are barred by the three-year statute of limitations under the Copyright Act.  *See* 17 U.S.C. § 507(b).[15]  Plaintiff alleges that Showtime produced and aired *Huff*, and that those alleged acts ended by June 26, 2006—more than three years before he filed this action.  *See* FAC, p. 3 & ¶¶ 6, 8.[16]  Plaintiff also admits that he discovered his claims on November 7, 2004. *Id.*, ¶ 6.  Plaintiff's claims against Showtime are clearly time-barred.  *See Parks v. ABC, Inc.*, 2008 U.S. Dist. LEXIS 5085, at *8 (S.D.N.Y. Jan. 24, 2008) (dismissing claim where complaint alleged that defendant's latest date of exploitation was more than three years prior to filing).

## V.    CONCLUSION

For the reasons set forth above, Plaintiff's Amended Complaint against Movants should be dismissed in its entirety, with prejudice.

DATED:  Los Angeles, California                Respectfully submitted,
                September 30, 2016

By: _____
        Elaine K. Kim

---

[15] The statute of limitations for conversion or conspiracy to commit conversion is similarly three years. *Jackson v. Broad. Music, Inc.*, 2006 U.S. Dist. LEXIS 3960, at *28 (S.D.N.Y. Jan. 31, 2006), *aff'd*, 2007 U.S. App. LEXIS 23492 (2d Cir. Oct. 5, 2007) (conversion); *Excell v. City of N.Y.*, 2012 U.S. Dist. LEXIS 93080, at *13-14 (E.D.N.Y. July 3, 2012) (conspiracy).

[16] Pursuant to this Court's March 17, 2015 Order, Plaintiff was required to allege "by what acts, during what time, the defendant infringed on the copyright."  Dkt. 5, p. 3 (citing *Transcience Corp. v. Big Time Toys, LLC*, 50 F. Supp. 3d 441, 449 (S.D.N.Y. 2014)).