IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

ROMANUS CASTRO,

          *Plaintiff,*

    – against –

JOHN CUSACK, et al.,

          *Defendants.*

**ECF Case**

Case No. 15 Civ. 6714 (ENV) (LB)

Service Date:  September 30, 2016

**DEFENDANT TOUCHSTONE TELEVISION PRODUCTIONS, LLC, d/b/a ABC STUDIOS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS THE AMENDED COMPLAINT WITH PREJUDICE AND TO STRIKE PLAINTIFF'S REQUEST FOR PUNITIVE DAMAGES**

SCHWARTZ & THOMASHOWER LLP
15 Maiden Lane, Suite 705
New York, NY  10038-5120
Tel:  212-227-4300

## **TABLE OF CONTENTS**

I.     INTRODUCTION .............................................................................................. 1

II.    FACTUAL BACKGROUND ........................................................................... 3

    A.  Plaintiff's Screenplay ............................................................................3

    B.  The *Dirt* Television Series ....................................................................6

    C.  Plaintiff's Access Allegations ...............................................................7

III.   PLAINTIFF'S AMENDED COMPLAINT MUST BE DISMISSED ............................. 8

    A.  Legal Standard For Rule 12(b)(6) Motion ..................................................8

    B.  Plaintiff Fails To State a Claim of Copyright Infringement ..........................9

        1.  Plaintiff Fails to Adequately Allege That ABC Had Access
            to the Screenplay ....................................................................11

        2.  Any Alleged Similarities Between The Works Are
            Of Unprotectable Elements Of Expression ...........................................12

        3.  There Is No Substantial Similarity Between Any Protectable
            Elements of The Screenplay and *Dirt* As A Matter Of Law..................................15

            a.  There Is No Similarity in Plot or Sequence of Events
                Between Dirt and The Screenplay ............................................. 16

            b.  There Is No Protectable Similarity Between The Characters
                of The Works ..................................................................... 18

                *(i)  Chase Anderson, Sandra, and Lucy Spiller* .....18
                *(ii) Jared Keller and Don Konkey*..........................20

            c.  The Dialogue Is Not Substantially Similar ............................... 22

            d.  The Central Themes of The Works Are Different ..................... 22

            e.  The Pace is Completely Different............................................ 22

            f.  The Moods of the Works Are Different................................... 23

            g.  The Setting Does Not Establish Substantial Similarity ........................... 23

IV.   PLAINTIFF'S CONVERSION AND CONSPIRACY
      CLAIMS ARE PREEMPTED ................................................................... 24

V.    CONCLUSION.................................................................................... 25

## **TABLE OF AUTHORITIES**

**Cases**

*A Slice of Pie Productions, LLC. v. Wayans Brothers Entertainment*,
  392 F.Supp 297 (D. Conn. 2005) ........................................................................... 25

*Acker v. King,* 46 F. Supp.3d 168 (D. Conn. 2014) .................................................... 12

*Adams v. Warner Bros. Pictures Network*, No.
  05 Civ. 5211 (SLT)(LB), 2007 WL 1959022 (E.D.N.Y. June 29, 2007) ................................ 10

*Aschcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct.1937, 173 L.Ed.2d 868 (2009) ................................. 8

*Atlanta Shipping Corp. v. Chemical Bank,* 818 F.2d 240 (2d Cir. 1987) .................................... 24

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ............. 8

*Blakeman v. The Walt Disney Co.,* 613 F. Supp. 2d 288 (E.D.N.Y. 2009) ................. 9, 12, 14, 16

*Boisson v. Banian, Ltd,* 273 F.3d 262 (2d Cir. 2001) .................................................. 10

*Brown v. Perdue*, No. 04-Civ-7417 (GBD),
  2005 WL 1863673 (S.D.N.Y. Aug. 4, 2005), *aff'd*, No. 05-4840-CV,
  177 Fed App'x 121 (2d Cir. 2006) ......................................................................... 15

*Dickinson v. Igoni*, 908 N.Y.S.2d 85 (NYAD 2d Dept. 2010) .................................... 24

*Dimmie v. Carey*, 88 F. Supp.2d 142 (S.D.N.Y. 2000) ........................................... 11, 12

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
  499 U.S. 340, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991) ........................................... 9

*Fisher-Price v. Well-Made Toy Mfg, Corp.,* 25 F.3d 119 (2d Cir. 1994) .................................... 10

*Flaherty v. Filardi,* 388 F.Supp.2d 274 (S.D.N.Y. 2005) ....................................... 21, 22

*Gal v. Viacom Intern. Inc.*, 518 F.Supp.2d 526 (S.D.N.Y. 2007) ............................ 11, 12, 18, 19

*Gary Friedrich Enterprises, LLC v. Marvel Enterprises, Inc.*,
  713 F.Supp.2d 215 (S.D.N.Y. 2010) ..................................................................... 25

*Granger v. Gill Abstract Corp.,* 566 F.Supp.2d 323 (S.D.N.Y. 2008). ........................................ 25

*Green v. Lindsey*, 885 F. Supp. 469 (S.D.N.Y. 1992) .................................................. 22

*Hallford v. Fox Entertainment Group, Inc.,* No. 12-CV-1806 (WHP),
  2013 WL 541370, (S.D.N.Y. Feb. 13, 2013), *aff'd.,* No. 13-CV-920,
  556 Fed.Appx. 48 (2d Cir. Feb. 28, 2014) ............................................. 8, 9, 10, 24

Table of Athorities, Cont'd.

*Hebrew Inst. for Deaf and Exceptional Children v. Kahana,*
57 A.D.3d 734, 870 N.Y.S.2d 85 (NYAD 2d Dep't 2008) ...................................................... 24

*Hogan v. DC Comics,* 48 F. Supp. 2d 298 (S.D.N.Y. 1999) ................................................. passim

*Jorgensen v. Epic/Sony Records,* 351 F.3d 46 (2d Cir. 2003) ................................................. 9, 11

*Knitwaves, Inc. v. Lollytogs Ltd,* 71 F.3d 996 (2d Cir. 1995).................................................. 10, 15

*Kregos v. The Assoc. Press.,* 3 F.3d 656 (2d Cir. 1993) ................................................................ 12

*Lapine v. Seinfeld,* No. 09-CV-4423, 2010 WL 1688713 (2d Cir. Apr. 28, 2010) ..................... 10

*Lewinson v. Henry Holt & Co., LLC,* 659 F. Supp. 2d 547 (S.D.N.Y. 2009) ................................ 9

*Mallery v. NBC Universal, Inc.,* No. 07-Civ-2250 (DLC),
2007 WL 4258196 (S.D.N.Y. Dec. 3, 2007) ............................................................................ 14

*Meese v. Miller,* 79 A.D.2d 237, N.Y.S.2d 496 (NYAD 4th Dep't 1981) ................................... 24

*Miller v. Holtzbrinck Publishers, LLC,* No. 08 Civ. 3508 (HB),
2008 WL 4891212 (S.D.N.Y. Nov. 11, 2008)........................................................................... 25

*Mowry v. Viacom Intern., Inc.,* No. 03-Civ-3090 (AJP),
2005 WL 1793773 (S.D.N.Y. July 29, 2005) ........................................................................... 11

*Muller v. Twentieth Century Fox, Inc.,* 794 F.Supp.2d 429 (S.D.N.Y. 2011) ................. 18, 19, 22

*Nichols v. Universal Pictures Corp.,* 45 F.2d 119 (2d Cir. 1930) ............................................... 13

*Peter F. Gaito Architecture, LLC v. Simone Development Corp.,*
602 F.3d 57 (2d Cir. 2010) ................................................................................ 9, 10, 13, 15

*Price v. Fox Entertainment Group, Inc.,* 473 F.Supp.2d 446 (S.D.N.Y. 2007) ..................... 10, 24

*Reyher v. Children's Television Workshop,* 533 F.2d 87 (2d Cir. 1976)...................................... 12

*Walker v. Time Life Films, Inc.,* 784 F.2d 44 (2d Cir. 1986)....................................................... 20

*Williams v. A&E Television Networks,* 122 F. Supp.3d 157 (E.D.N.Y. 2015)...................... passim

*Zambito v. Paramount Pictures Corp.,* 613 F.Supp. 1107 (E.D.N.Y. 1985)............................... 23

Defendant Touchstone Television Productions, LLC s/h/a and d/b/a ABC Studios ("ABC")[1] submits this Memorandum of Law in support of its motion, pursuant to Federal Rule Of Civil Procedure 12(b)(6), for an order dismissing the Amended Complaint ("AC") as against ABC because it fails to state a claim upon which relief can be granted and, pursuant to Federal Rule of Civil Procedure 12(f), to strike Plaintiff's claim for punitive damages.

## I.   <u>INTRODUCTION</u>

Plaintiff Romanus Castro ("Castro") claims that in 2003 he mailed a copy of his screenplay "The Summit of Beauty and Love" (the "Screenplay") to John Cusack's agent at The William Morris Agency ("WMA").[2]  Based on that unsolicited submission, Castro has brought this case claiming that ABC's television series *Dirt* – with which Mr. Cusack is not alleged to be associated – infringes his Screenplay.  The gravamen of Castro's claim is that he owns the exclusive right to use the idea of a story about a relationship involving a celebrity reporter and a schizophrenic.  Castro's idea is not remotely protectable, and he has no more right to the exclusive use of that idea then he does to a story about the relationship between a parent and a disabled child.

Castro nevertheless claims that *Dirt* is substantially similar to the Screenplay.  Castro's claims for copyright infringement, however, must be dismissed with prejudice.  Even if Castro could show actual copying notwithstanding his failure to allege that anyone even remotely connected with *Dirt* ever had access to the Screenplay, a comparison of *Dirt* and the Screenplay destroys any claim of substantial similarity between the two works.  After comparing both works, no one would or could conclude that they are substantially similar.  They are not.

The Screenplay is a love story.  It chronicles music reporter Chase Anderson's journey as he meets and falls in love with Jared Keller, a young musician he is assigned to interview, who uses illicit drugs to ward off his schizophrenia, which he keeps secret.  As their volatile love

---

[1] Although Plaintiff has named and served "ABC Studios" and "Touchstone Television Productions, LLC" separately, they are the same entity.  Touchstone Televisions Productions, LLC d/b/a ABC Studios is the proper party, and is the party which has appeared and which is making this motion.

[2] A copy of the AC is annexed as Exhibit A to the accompanying Declaration of Rachel Schwartz, dated September 30, 2016 (the "Schwartz Dec.").

story unfolds, Jared's secret is revealed, and Chase transforms from an ambitious and emotionally stunted workaholic to a loving caretaker, who trades his successful career at a venerable music publication to manage Jared's career and teach creative writing to homeless children.

In sharp contrast, *Dirt* is a Faustian epic drama about the deception and misery underlying the world of tabloid journalism.  Through its various story lines of blackmail, murder, drug addiction, sexual fantasy, and betrayal, the series explores the sell your soul bargains tabloid publications make with the rich and famous (and their underlings) for the "dirt" hidden just beneath the surface of their carefully constructed public image.  At *Dirt's* epicenter is antihero Lucy Spiller, the powerful and icily beautiful editor-in-chief of the tabloid magazine "Dirt/Now."  Lucy is joined by her best friend, paparazzo Don Konkey, a "functioning schizophrenic," who will do anything, including sacrificing minor body parts, to get Lucy her shot.  The drama unfolds around this unlikely friendship as each week Lucy and her team scramble to break another exclusive cover.

Notwithstanding the obvious dissimilarity between the Screenplay and *Dirt* in plot, character, style, approach and focus, Castro cobbles together a list of minor, scattered similarities between the works.  To the extent any similarities exist, whether in incident, plot point, or dialogue, they are unprotectable scènes à faire that predictably flow from a story involving a love relationship between a celebrity reporter and an artist with mental health issues.[3]

In short, the Screenplay and *Dirt* are vastly different works and anyone who reviews them both would immediately recognize that *Dirt* is nothing like the Screenplay.  It is not even close.  Accordingly, Plaintiff's claim for copyright infringement, as well as his claims for conversion and conspiracy, which are preempted by his infringement claim, must be dismissed with prejudice and without leave to replead.

---

[3] These purported similarities are not specifically pleaded in the AC but are listed on a table annexed thereto as Exhibit C.  Because Plaintiff has mischaracterized the referenced scenes in both works and the time stamps are inaccurate, attached hereto for the Court's convenience and ease of reference is an appendix with the correct time stamps and which accurately describes the referenced scenes.

II.     **FACTUAL BACKGROUND**[4]

A.     **Plaintiff's Screenplay**

Plaintiff alleges that he wrote the Screenplay in 2003, AC ¶ 5, and registered it with the

United States Copyright Office twelve years later on June 19, 2015.  AC, Ex. B.[5]

Set in New York City, the Screenplay opens with reporter and protagonist Chase

Anderson orchestrating an interview with a top female vocalist.  AC, Ex. A at 1-6.  Thrilled with

the interview, Chase's boss Sandra, the owner and editor-in-chief of Music Slate magazine, next

assigns Chase to cover Jared Keller, a newcomer who recently turned down a million dollar

recording contract and is deep into pharmaceuticals.  *Id.* at 7-10.  As he callously dismisses a

homeless man selling pencils and his boyfriend moves out, we see that Chase is cynical and

emotionally unavailable.  *Id.* at 7, 11-14.

That begins to change when he meets Jared.  As Chase watches Jared rehearse, the

personal and professional converge.  Jared's song moves Chase deeply and his talent reminds

Chase of why he became a music journalist; music, it seems, soothes his soul.  AC, Ex. A at 11,

14-16, and 28.  Jared's volatility – he violently ends their first interview – nearly ends the

relationship before it starts.  *Id.* at 19-25.  However, the intensity of Chase's reaction – Jared is

not the first musician who has "dissed" him – suggests he is more engaged than he realizes.  *Id.*

at 16-19, 25-26.

Jared's eruption leaves him shaken and remorseful.  He comforts himself with drugs and

a visit to his sister Trina, which she hides from their mother, foreshadowing one cause of Jared's

struggles.  AC, Ex. A at 24-28.  Finally, he makes his way over to Chase's house to apologize

but is mugged en route.  As Chase springs into action, any lingering anger dissipates.  Chase

cleans Jared's wounds, helps him into bed after he passes out in the shower, and makes him

breakfast the next morning.  *Id.* at 30-37.  Back at Music Slate's offices the next day, Chase

---

[4] For purposes of this motion, ABC accepts as true the factual allegations in the AC, except those that are flatly
contradicted by judicially noticeable facts. *See, also, Blakeman v. The Walt Disney Co.*, 613 F. Supp. 2d 288, 293,
297-298 (E.D.N.Y. 2009); *Hallford v. Fox Entertainment Group, Inc.*, No. 12-Civ-1806 (WHP), 2013 WL 541370,
at *2-*3 (S.D.N.Y. Feb. 13, 2013).  For the record, however, ABC denies Plaintiff's factual allegations.
[5] A copy of the Screenplay is attached to the AC as Exhibit A and is part of the court record.

dismisses the hint of a brewing attraction, insisting it is just business.  *Id.* at 37-38.

Business soon yields to pleasure and they consummate their relationship.  AC, Ex. A at 40-45.  Although much to his distress, Chase finds Jared having sex with someone else the next day, Jared expresses genuine feelings for Chase, and they begin dating.  *Id.* at 45-48.  Jared introduces spontaneity into Chase's life.  And Chase slowly lets down his guard and is having fun.  *Id.* at 48-50.  Sadly, their growing intimacy triggers Jared's feelings of unworthiness, prompting him to abandon Chase on a park bench to grab a "few beers" to self-medicate.  Chase's defensive wall shoots back up, but Jared's willingness to reveal his inner struggle successfully tears it back down, and all is forgiven.  *Id.* at 48-54.

Palpable shifts in Chase's professional approach are readily attributable to his burgeoning relationship with Jared: he stops ignoring the homeless man selling pencils and persuades Sandra to hold a story because of its devastating impact.  AC, Ex. A at 54-57, and 60.  Unfortunately, Jared's overwhelming self-doubts and continued drug use are intensifying his self-destructive behavior.  *Id.* at 57-60, 62-64.  Convinced that commercial success will be Jared's panacea, Chase negotiates a recording contract for Jared.  *Id.* at 60-62.  At Chase's urging, Jared agrees to sign a recording deal.  *Id.* at 64-65.  But Chase and Jared are about to be dealt a severe blow.  Unbeknownst to Jared, Sandra completed the story about Jared that Chase could not and refused Chase's demand that she stop the presses.  *Id.* at 66-68.  Jared finds out about the cover just before his showcase performance, from someone other than Chase.  Pandemonium erupts, and Jared is hospitalized.  *Id.* at 68-75.

Chase learns that Jared has schizophrenia, that he has had it for some time and has been weaning himself off his medication, and that the other drugs have masked his symptoms.  Chase is stunned, but starts to put together the pieces of Jared's behavior.  AC, Ex. A at 76-78.  Back at Music Slate's offices, Chase shares this with Sandra, who listens intently and responds empathetically.  Sandra urges Chase to put love ahead of his career, and then reassures him that she will pull strings to keep Jared's schizophrenia out of the press.  *Id.* at 80-81.

Disappointed that Jared's mother Joyce has neither returned his calls nor visited Jared in the hospital, Chase pays her a visit.  From her, Chase learns the history of Jared's illness, the destructive impact it has had on their family, and that Jared's father, who also was schizophrenic, committed suicide when Jared was a baby.  Chase, however, becomes enraged at Joyce's rejection of Jared, implores her to see that Jared needs her, and admonishes her for trying to wish him away like a bad cold.  *Id.* at 83-90.

At the hospital, Jared is still refusing his medication.  Chase professes his love for Jared, begs him not to give up and assures him that he will be with him as he learns to live with his illness.  Jared turns to Chase, his eyes filled with tears, and begins to describe his schizophrenia.  Moments later, Jared finally takes his medicine.  And Chase is filled with relief, knowing that Jared "is on the way to recovery."  AC, Ex. A at 90-94.

Six months later, Jared has made great progress.  He is taking his medication, and, in therapy, he explores his past.  As he begins to understand the connection between his mother's rejection and his self-destructive behaviors, he feels worthy of love.  With Chase's support, Jared records his first album, performs at Radio City Music Hall, and realizes his dream of hearing himself on the radio.  AC, Ex. A at 95-102.

As for Chase, he is surrounded by children in a homeless shelter, who are giggling with glee.  AC, Ex. A at 95-96.  He turns in his last story and takes an indefinite leave of absence. *Id.* at 97-99.  As the story ends, Jared and Chase slip out unnoticed from the celebration of Jared's radio debut, while the scene fades to Jared's mother sitting quietly by her radio blowing smoke rings.  *Id.* at 102-104.  We last see Chase and Jared sitting on a bench eating snow cones.  As they pledge their love, Jared playfully dumps his snow cone in Chase's lap and they begin chasing each other like "two kids set loose in a playground.  Which they are of course."  *Id.* at 106.

B.      The *Dirt* Television Series[6]

*Dirt* tells the story of tabloid editor-in-chief Lucy Spiller's obsession with telling the truth in a world where image is everything and truth counts for little.  Ep.1, 0:30-40.  If it is not true, Lucy Spiller will not print it.  *Id.*  2:13-2:27, 5:03-5:15.  Smart and intuitive, Lucy has a nose for the "dirt," no matter how deeply buried, and is mercilessly driven to break her next exclusive cover, which stimulates her far more than any man ever will.  It is of little moment to Lucy that the absolute truth she so relentlessly pursues generally leaves a massive trail of destruction in her wake.  Ep.1, 1:20-2:11; Ep.6, 43:10-43:56.

The cost of Lucy's obsession with the truth creates conflict with both the tabloid's puerile publisher, Brent Barlow, whose penchant for younger woman, salacious sex, drugs and money almost lands him on *Dirt/Now's* cover and eventually kills him (Ep.10, 4:33-6:55; 11:05-13:47; Ep.20, 35:00-35:29), as well as with the tabloid's rich and powerful owner, Gibson Horne, who, though enamored of Lucy's calculating methods, worships exclusively at the altar of the almighty dollar.  When the tabloid's circulation drops even a little, Horne threatens to replace Lucy with her friend and rival Tina Harrod.  Lucy cleverly responds with a proposal to merge "Dirt" and "Now" into "Dirt/Now," which saves her job and allows her to continue shelling out exorbitant amounts of money to scoop her competition.  Ep.1, 25:42-26:42, 29:15-30:08; Ep.2, 7:25-9:16, 42:30-44:01.

Haunted by her father's cryptic suicide note since the age of fifteen, the stunning and powerful Lucy has but one friend, Don, her go-to schizophrenic photographer.  Ep.3, 0:01-13.  Lucy genuinely cares about Don, almost as much as she cares about the cover shot he is getting her.  *Id.*  38:36-38:44, 52:17-53:01; Ep.4, 23:13-23:34.  Lucy also loves her brother Leo unconditionally, though she does not hesitate to have Don follow him when she guesses (rightly) that he is keeping a secret from her.  Ep.3, 16:02-16:41, 23:24-24:43.

---

[6] Both seasons of *Dirt* are attached to the Schwartz Dec. as Exhibit B. References to "Ep.__, 0:00" are to the cited episode and time stamp of the corresponding episode on the DVDs; Season 1 DVD contains episodes 1-13 and Season 2 contains episodes 14-20.

*Dirt* takes place in present day Hollywood, and spans nearly two years, if not more. Ep.1, 32:15-32:22; Ep.20.  Although there are recurring themes, characters and plot points, each episode generally stands alone as a discreet work with a beginning, middle and end.  The focus of every episode is the quest for Lucy's cover story, many of which are immediately recognizable as being ripped directly from then current celebrity headlines.

In many ways, *Dirt* is a modern Faustian epic drama.  In exchange for Lucy's promise to keep their dirty secrets off the cover and in her "vault," scared celebrities agree to be her source, even if it means betraying a loved one or risking their life.  Ep.1, 27:20-28:20; Ep.12, 34:20-35:40.  But not every secret is worthy of Lucy's vault and she will not own just anyone.  If the secret is itself the higher truth Lucy is pursuing, no Faustian bargain will keep it off her cover, regardless of the consequences.  Ep.12*,* 36:28-39:48.  Throughout the series, Lucy and her team pursue countless stories, including a celebrity couple who fake a pregnancy (Ep.2); an internationally acclaimed action hero who turns out to be gay (Ep.3, 4, 5), and a popular evangelical singer who burns her face freebasing (Ep.3) to name a few.  Lucy and her team are held hostage at gunpoint by a former child star who demands Lucy make him relevant again.  (Ep.9).  And, at the end of season one, a once famous actress who blames Lucy for destroying her life, breaks into Lucy's home and nearly stabs her to death.  Ep.13, 42:34-43:45.  In Lucy fashion, before passing out in a pool of blood, she calls Don and orders him to get the shot before calling the police.  *Id.* at 43:45-45:22.

*Dirt* debuted on January 2, 2007 on the FX channel, and ran for one and a half seasons, ending on April 13, 2008.  AC, ¶ 8.  There are twenty episodes in all.  Schwartz Dec., Ex. B.

## C.    Plaintiff's Access Allegations

Plaintiff claims that, shortly after he wrote the Screenplay in 2003, he mailed it to John Cusack, care of his agent Gaby Morgerman, at WMA and never received a response.  AC ¶ 5.  Although Plaintiff speculates that the Screenplay made its way to *Huff's* producer Bob Lowry, the AC contains no specific allegations that anyone other than Ms. Morgerman ever had the opportunity to see the Screenplay, and certainly none that plausibly link the Screenplay *Dirt* or

anyone connected with its production.  *Id.* ¶¶ 7 and 43.[7]  And, neither Mr. Cusack, Ms.

Morgerman nor WMA are alleged either to have any connection to the creators of *Dirt* or to have

provided the Screenplay to anyone that did.  *Id* ¶¶ 42-43.

Nevertheless, Plaintiff attempts to allege ABC's access to the Screenplay through actors

and individuals who at best are peripherally related to *Dirt*.  Plaintiff alleges that defendant Hank

Azaria, the star of *Huff,* is related to *Dirt* because Mr. Azaria's ex-wife Helen Hunt is married to

*Dirt's* creator, Matthew Carnahan and he worked with Courtney Cox, *Dirt's* star and one of its

producers, on her hit series *Friends* in the 1990s.  AC ¶ 43.  Plaintiff further alleges that Kiersten

Warren, an actress who appeared in one episode of *Dirt* during its second season*, worked with

John Cusack on a movie years before Plaintiff wrote the Screenplay.  *Id.*

## III.   PLAINTIFF'S AMENDED COMPLAINT MUST BE DISMISSED

### A.   Legal Standard For Rule 12(b)(6) Motion

To survive a motion to dismiss, "a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Williams v. A&E*

*Television Networks*, 122 F. Supp.3d 157, 161 (E.D.N.Y. 2015) (quoting *Aschcroft v. Iqbal*, 556

U.S. 662, 129 S.Ct.1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550

U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).  Legal conclusions, however, "are not

entitled to the presumption of truth, and a court assessing the sufficiency of a complaint

disregards them."  *Id.*  Claims will only survive a motion to dismiss if the plaintiff has plead

enough factual content to allow the court to draw the reasonable inference that the defendant is

liable for the alleged misconduct.  *See, e.g., Hallford v. Fox Entertainment Group, Inc.,* No. 12-

CV-1806 (WHP), 2013 WL 541370, at *2-*3 (S.D.N.Y. Feb. 13, 2013), *aff'd,. Hallford v. Fox*

*Entertainment Group, Inc.*, No. 13-CV-920, 556 Fed.Appx. 48 (2d Cir. Feb. 28, 2014).[8]

In deciding this Rule 12(b)(6) motion, the Court may consider materials the AC

incorporates by reference as well as documents which are integral to it.  Because *Dirt* is

---

[7] *Huff* is one of the other television series Plaintiff claims infringes the Screenplay in this action.

[8] While the Court may liberally interpret Plaintiff's pleading to raise the strongest possible argument because he is *pro se,* Plaintiff is not relieved of his duty to plead sufficient factual content giving rise to a plausible claim.  *See, e.g., Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003).

incorporated by reference in the AC and integral to Plaintiff's copyright claim, the Court can consider it on this motion. *See, e.g., Peter F. Gaito Architecture, LLC v. Simone Development Corp.*, 602 F.3d 57, 59-60 (2d Cir. 2010); *Hallford*, 2013 WL 541370 at *2; *Blakeman v. The Walt Disney Co.*, 613 F. Supp. 2d 288, 299 (E.D.N.Y. 2009).

### B.    Plaintiff Fails To State a Claim of Copyright Infringement

To establish copyright infringement, Plaintiff must prove that (1) he owns a valid copyright, and (2) constituent elements of the Screenplay that are *original* were copied. (emphasis added). *See, e.g., Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991); *Jorgensen v. Epic/Sony Records*, 351 F.3d at 51.  To prove the second element, Plaintiff must do more than establish that there was actual copying.  He must demonstrate that the copying was ***illegal*** because a substantial similarity exists between *Dirt* and the ***protectable*** elements of the Screenplay.  *See, e.g., Peter F. Gaito Architecture, LLC,* 602 F.2d at 63; *Lewinson v. Henry Holt & Co., LLC,* 659 F. Supp. 2d 547, 562 (S.D.N.Y. 2009).

However, when the works are before the court, as they are here, it is well settled that copyright infringement claims can be dismissed at the pleading stage "either because the similarity between two works concerns only non-copyrightable elements of the plaintiff's work or because no reasonable jury, properly instructed could find that the two works are substantially similar." *Peter F. Gaito Architecture, LLC.,* 602 F.3d at 63 (internal quotations omitted).  Here, both would be true.

As the Second Circuit explained:

> [T]he works themselves supersede and control contrary descriptions of them, including any contrary allegations, conclusions or descriptions of the works contained in the pleadings.  When a court is called upon to consider whether the works are substantially similar, no discovery or fact-finding is typically necessary, because what is required is only a visual comparison of the works.

*Id*. at 64 (internal citations omitted): *Williams v. A&E Television Networks*, 122 F.Supp.3d 157, 161-163 (S.D.N.Y. 2015) (granting motion to dismiss).  Accordingly, courts in this circuit routinely dismiss copyright infringement claims on a Rule 12(b)(6) motion when a comparison of the works confirms they are not substantially similar.  *See, e.g., Peter F. Gaito Architecture,*

*LLC,* 602 F.3d at 63-64; *Hallford v. Fox Entertainment Group, Inc.,* 2013 WL 541370, at *3 (story about journalist and autistic orphan boy solving mysteries in people's lives not substantially similar to story about former journalist and autistic son solving mysteries in people's lives); *Williams*, 122 F. Supp. 3d at 157; *Blakeman,* 613 F. Supp. 2d at 299.

The standard test for substantial similarity between two works is "whether an ordinary lay observer would overlook the dissimilarities between the artistic (protectable) aspects of the two works and would conclude that one was copied from the other." *Fisher-Price v. Well-Made Toy Mfg, Corp.,* 25 F.3d 119, 123 (2d Cir. 1994). *See also, Peter F. Gaito Architecture, LLC,* 602 F.3d at 66 (internal citations omitted); *Hogan v. DC Comics,* 48 F. Supp. 2d 298, 309 (S.D.N.Y. 1999).

Where, as here, the copyrighted work contains protectable and unprotectable elements, the discerning observer test is used. *Peter F. Gaito Architecture, LLC,* 602 F.3d at 66. This test requires "substantial similarity between those elements, and only those elements, that provide copyrightability to the allegedly infringed [work]." *Lapine v. Seinfeld*, No. 09-CV-4423, 2010 WL 1688713, at *1 (2d Cir. Apr. 28, 2010)(quoting *Boisson v. Banian, Ltd,* 273 F.3d 262, 272 (2d Cir. 2001)). In applying the discerning observer test, the court must "attempt to extract the unprotectable elements from [its] consideration and ask whether the protectable elements, *standing alone* are substantially similar." *Peter F. Gaito Architecture LLC,* 602 F.3d at 66 (*citing, Knitwaves, Inc. v. Lollytogs Ltd,* 71 F.3d 996, 1002 (2d Cir. 1995)).

As we now demonstrate, Plaintiff cannot satisfy either element of his copyright claim. First, he has failed to plead that ABC actually copied the Screenplay.[9] And, second, when the Court compares *Dirt* and the Screenplay– as opposed to Plaintiff's inaccurate portrayal of both works – there can be no doubt that (a) any common elements are unprotectable; and (b) *Dirt* and the Screenplay are not substantially similar as a matter of law.

---

[9] Absent direct evidence of copying, unlikely here given the allegations, Plaintiff also must show that *Dirt's* creators had access to the Screenplay and that any similarities are probative of copying. *See, e.g., Adams v. Warner Bros. Pictures Network*, No. 05 Civ. 5211 (SLT)(LB), 2007 WL 1959022, at *3 (E.D.N.Y. June 29, 2007).

10

1. **Plaintiff Fails to Adequately Allege That ABC Had Access to the Screenplay**

Plaintiff's copyright claim fails and the AC should be dismissed because it is devoid of *any* facts from which this Court could reasonably infer that ABC ever had access to the Screenplay.  Access means that an alleged infringer had a "reasonable possibility," not simply a "bare possibility of [reading or hearing] the prior work; access cannot be based on mere "speculation or conjecture."  *Jorgensen v. Epic/Sony Records*, 351 F.3d at 51.

Absent direct evidence of ABC's access, Plaintiff was required to plead either that the Screenplay was widely disseminated or that "a particular chain of events exists by which [ABC] might have gained access to the work."  *Gal v. Viacom Intern. Inc.*, 518 F.Supp.2d 526, 538 (S.D.N.Y. 2007).  Plaintiff has failed to plead either.

Because the Screenplay is unpublished, Plaintiff cannot maintain that it has been widely disseminated.  *See, e.g., Gal v. Viacom Intern. Inc.*, 518 F. Supp.2d at 538 ("[w]here a work is unpublished, as in the case at bar, it is considered not to have been widely disseminated").

Nor has Plaintiff alleged a chain of events by which *Dirt's* creators might have gained access to the Screenplay.  Plaintiff's unsolicited mailing of the Screenplay to Gaby Morgerman is legally insufficient to establish access by any of the Defendants, particularly since Plaintiff fails to allege that he received a return receipt for that mailing and the defendants are engaged in the book, film, or music industry, which are all subject to numbers of unsolicited submissions daily.  *See, e.g., Dimmie v. Carey*, 88 F. Supp.2d 142, 145-148 (S.D.N.Y. 2000) (Plaintiff's unsolicited and undocumented mailings of her song to Mariah Carey and Columbia Music Studios were insufficient to establish access by any of the Defendants); *Mowry v. Viacom Intern., Inc.*, No. 03-Civ-3090 (AJP), 2005 WL 1793773, *4-7 (S.D.N.Y. July 29, 2005) (no chain of events for access established where the various individuals with contacts to the "entertainment" and "advertising" industry who admitted to having read the plaintiff's screenplay were not alleged to have shown the screenplay to defendant film-makers).

Regardless, far from linking ABC to the Screenplay, the chain of events Plaintiff alleges ended with the one person to whom he sent the Screenplay, Ms. Morgerman.  Plaintiff does not

allege that Ms. Morgerman gave the Screenplay to anyone, including Mr. Cusack, let alone
anyone with a role in creating *Dirt*.  Equally unavailing is Plaintiff's speculation that the creators
of *Dirt* had access to the Screenplay because John Cusack worked with an actress who appeared
in one episode of season two of *Dirt* in 2008 or worked with an actor whose ex-wife is now
married to *Dirt's* creator.  *See, e.g, Gal v. Viacom Intern,* Inc., 518 F.Supp.2d 526, 538
(S.D.N.Y. 2007).  And, even assuming John Cusack ever saw the Screenplay – and the
allegations preclude such a finding – in the film industry, it is patently "unreasonable" to
attribute knowledge of a screenplay by one individual at one company to other individuals or
film companies simply because they may know each other or may have worked together.  *See,
e.g.*, *Dimmie*, 88 F. Supp.2d at 146-148.

### 2.     Any Alleged Similarities Between The Works Are Of Unprotectable Elements Of Expression

The only common element between the Screenplay and *Dirt* exists at the highest general
level in that both works involve the unprotectable idea that a celebrity journalist has a
relationship with a schizophrenic.  *See, e.g., Acker v. King,* 46 F. Supp.3d 168 (D. Conn. 2014)
(general likeness between unprotectable elements insufficient for copyright infringement;
complaint dismissed).  Any other arguably common elements between the two works are stock
concepts and generic scènes à faire that flow naturally from this unprotectable idea.  And even
those unprotected elements are few and far between.

It is a fundamental principle of copyright law that "'copyright does not protect an idea,
but only the expression of an idea.'"  *Blakeman v. The Walt Disney Co.,* 613 F. Supp. 2d at 305,
*quoting, Kregos v. The Assoc. Press.,* 3 F.3d 656, 663 (2d Cir. 1993).  *See also, Hogan v. DC
Comics,* 48 F. Supp. 2d 298, 308 (S.D.N.Y. 1999) (*citing, Williams v. Crichton,* 84 F.3d 581, 587
(2d Cir. 1996)).  The "essence of infringement lies in taking not a general theme but its particular
expression through similarities of treatment, detail, scenes, events and characterization."  *Reyher
v. Children's Television Workshop,* 533 F.2d 87, 91 (2d Cir. 1976).  Judge Learned Hand has
formulated the distinction between ideas and their expression as follows:

> Upon any work… a great number of patterns of increasing generality will fit equally
> well, as more and of the incident is left out.  The last may perhaps be no more than

the most general statement of what the [work] is about, and at times might consist of only its title, but there is a point in this series of abstractions where they are no longer protected, since otherwise, the [author] could prevent the use of his "ideas" to which, apart from their expression, his property is never extended.

*Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930) (internal citations omitted).

Similarly, stock scenes or "'scènes à faire, which have been described as 'scenes that necessarily result from the choice of a setting or situation"' are not protectable forms of expression.  *See, e.g., Hogan,* 48 F. Supp. 2d at 309 (internal citations omitted).  Nor are "incidents, characters or settings which are as a practicable matter indispensable, or at least standard, in the treatment of a given topic."  *Id.*  Finally, "thematic concepts…which necessarily follow from certain plot situations … are not entitled to copyright protection."  *Id.* (internal citations omitted.)

In this case, the idea of a story in which a seasoned music journalist falls in love with a younger, drug addicted musician he is assigned to write about, who turns out to be schizophrenic is just that, an idea that is not entitled to copyright protection as a matter of law.  Moreover, the Screenplay's overarching story and by extension its characters and scenes are based on well-known elements and themes: (a) the conflict between artistic integrity and commercial success; (b) the uneasy symbiosis between artists and the press; (c) parental rejection and loss; (d) the stigma of mental illness and (e) the transformative and healing power of love.  Quite simply, Plaintiff's idea based on common elements and themes drawn from everyday life cannot form the basis of an infringement claim.

Plaintiff nevertheless alleges a "list" of 25 purported similarities between the Screenplay and *Dirt* that are at the heart of his claim.  In evaluating that claim, the Court is to "determine whether any alleged similarities are due to protected aesthetic expressions original to the allegedly infringed work, or whether the similarity is to something in the original that is free for the taking."  *Peter F. Gaito Architecture, LLC,* 602 F.3d at 67 (internal quotation marks and citations omitted).  And, the Court need not address every alleged similarity because "the works themselves supersede and control contrary depictions of them."  *Id.* at 64 (internal quotation marks and citations omitted).

13

Moreover, courts have repeatedly warned that "scattershot" listings of random similarities sprinkled throughout the works cannot satisfy the substantial similarity test and hence a finding of copyright infringement. *See, e.g., Williams v. Crichton,* 84 F.2d at 590; *Blakeman,* 613 F.Supp. 2d at 310-311. Such lists are "inherently subjective and unreliable," and fail to address the essential issue of whether the works as a whole are substantially similar. *Id.* (internal quotations and citations omitted). *See also, e.g., Mallery v. NBC Universal, Inc.,* No. 07-Civ-2250 (DLC), 2007 WL 4258196, at *8 (S.D.N.Y. Dec. 3, 2007)(plaintiffs' "scattershot listing" of several highly generalized "similarities" did not demonstrate substantial similarities between the two works at issue).

The "similarities" that Plaintiff relies on are indeed unprotectable stock concepts or scènes à faire such as reporters hiding behind a bush or using other tricks to gain access to a celebrity; reporters talking on cell phones; disputes between rappers that end in violence; refusing to take medication because of its effects; celebrities who cheat on their lovers or who have outbursts and spill things; reporters who fall in love with their subjects; flirtations between co-workers; going through a loved one's personal effects for answers; a man with a messy apartment; and covering a distressed friend seeking refuge with a blanket. AC, Ex. C.

*Hogan v. DC Comics* is particularly instructive. 48 F. Supp. 2d 298, at 310 (S.D.N.Y. 1999). In *Hogan,* the Court analyzed the plaintiffs' copyright infringement claim:

> The two works share a similar basic underlying idea: they both involve a half-vampire character who is on a quest that leads him to discover his origins. Almost all of the remaining similarities between the works are unprotectible themes and concepts that flow predictably from this idea. A half –vampire, half-human character would necessarily have a "sinister genealogy." The quest of a half vampire who is searching for his origins would predictably involve a struggle and ultimate choice between good and evil, as the very essence of the character and the story is that such character has a "dual nature," and the use of flashback or memory is the most logical way to portray events from the character's past. The fact that the characters become indoctrinated into the forces of evil by killing is a similarly unprotectible theme that is not uncommon to horror or science fiction literature.

*Id.* Based on that analysis, the Court rejected plaintiffs' claim of substantial similarity even though both works: (1) have a main character who is a half-human, half-vampire named Nicholas Gaunt and is portrayed as a young, white male with pale skin, a medium build, dark

and tired eyes and scraggly hair; (2) use religious symbolism and Biblical allusions to tell the story of his quest to uncover the truth of his origins and his choice between good and evil; (3) tell the story using flashbacks; and (4) involve the main character in a romance.

The Court made a similar finding in *Brown v. Perdue*, No. 04-Civ-7417 (GBD), 2005 WL 1863673, at *6-*13 (S.D.N.Y. Aug. 4, 2005), *aff'd*, No. 05-4840-CV, 177 Fed App'x 121 (2d Cir. 2006).  In *Brown,* the Court rejected plaintiff's claim that the *Da Vinci Code* was substantially similar to his work even though both stories involved: (1) the role of the female in Christianity and the Church's recasting of the great goddess as evil; (2) the existence of the divine feminine, the historical figure of Constantine and his role in this process; (3) physical evidence of the female divine; (4) the fact that there are keepers of the physical evidence; (5) the Catholic church's awareness of the keepers and the evidence; (6) the existence of two organizations that seek to obtain that evidence; (7) the treatment of the Mary Magdalene; and (8) the use of historical references.  The Court held that these were non-protectable ideas common to the genre of biblically or historically based fiction or based on fact.

The lack of substantial similarity is even more compelling in this case.  Indeed, other than the fact that both *Dirt* and the Screenplay involve a celebrity journalist and a schizophrenic artist, the two works are totally dissimilar.

### 3.     There Is No Substantial Similarity Between Any Protectable Elements of The Screenplay and *Dirt* As A Matter Of Law

The Second Circuit has explained that in analyzing the substantial similarity of protected expression, the court is to be "principally guided" by comparing the contested work's "total concept and overall feel with that of the allegedly infringed work as instructed by good eyes and common sense."  *Peter F. Gaito Architecture LLC,* 602 F.3d at 66 (*citing, Knitwaves, Inc. v. Lollytogs Ltd,* 71 F.3d 996, 1002 (2d Cir. 1995)) (other internal citations and quotations omitted.)  For copying to be unlawful, the "works must share a similarity of expression, such as similarities of treatment, details, scenes, events, and characterization," or a similarity in their "total concept and feel."  *Hogan,* 48 F. Supp. 2d at 309.  However, similarities between protected expressions that are of small import quantitatively and qualitatively will not support a finding of substantial

similarity.  *Blakeman*, 613 F. Supp. 2d at 308.  The essence of the inquiry is therefore whether the two works tell the same story, or whether the contested work is an original and different expression.  *See, e.g., Williams v. Crichton*, 84 F.3d 581, 591 (2d Cir. 1996).

Under these guiding principles, no rational fact finder could read the Screenplay and watch *Dirt* and conclude that they tell the same story.  They do not.  And this is true regardless of whether the non-copyrightable ideas, stock concepts and scènes à faire and other unprotectable elements related to an adult drama about celebrities and journalists are "extracted."  As we now demonstrate, the total concept and feel of *Dirt* is not even remotely like that of the Screenplay.

### a.  There Is No Similarity in Plot or Sequence of Events Between Dirt and The Screenplay

The central plot of the Screenplay is the journey of two emotionally damaged men who fall in love, overcome their internal obstacles, and are able to alter the trajectory of their lives. Because of his growing feelings for the troubled Jared, Chase Anderson is forced to confront the impact of the stories he writes on the people he cares about as well as the void his career has created in both his heart and his humanity.  After a hospitalization finally reveals Jared's schizophrenia, Chase is at last able to choose a person over the story and lead a loving and meaningful life.  As for Jared, Chase's love for him (and Jared's for Chase) fills the void left by his mother's rejection, and Jared is at last able to choose recovery and health over self-destruction thereby allowing him to realize the breadth of his musical gift and achieve his dream of becoming a successful recording artist.

*Dirt's* premise is entirely different.  *Dirt* is an exploration of the symbiosis and Faustian bargains between celebrities and the press, and one woman's quest to expose the truth no matter the cost.  Each week, *Dirt* chronicles Lucy's efforts, with the help of her staff reporters and photographers – most notably Don Konkey and the young Spiller wannabe, writer Willa McPherson – to scoop her competition with the story no one else has or can get.  Their methods vary, and include subterfuge, blackmail, sex and drugs, and sometimes good old fashioned reporting.  Ep.1, 4:38-4:42; Ep.4, 34:40-35:57; Ep.6, 16:16-17:48.

In the various episodes – in which Lucy is always the center – the weekly cover story is intertwined with numerous plots and subplots as various story lines are followed and developed, and which are replete with thinly veiled references to celebrity scandals such as Alec Baldwin's raging message to his young daughter (Ep.15); Britney Spears shaving her head (Ep.18, 30:48-33:25); and Paris Hilton's arrest and immediate release from jail.  Ep.15, 4:54-5:16.

The pilot episode sets the stage for many of these recurring subplots.  For example, in the first episode, Don provokes fallen actor Holt McClaren into attacking him so that Lucy can convert him into a secret source in exchange for promising to revive his career through the magazine.  Ep.1, 6:19-10:40, 12:43-13:12; 27:21-27:59, 29:46-30:35; Ep.7, 15:04-16:00, 32:22-36:46.  To save his career, Holt betrays his girlfriend, actress Julia Mallory, and reveals that her best friend and actress Kira Klay is pregnant from a one-night stand.  Ep.1 at 32:20-34:09, 40:27-43:40, 47:46.  After Kira overdoses, Holt tries extract himself from his Faustian bargain until Lucy shows him a sex tape of his girlfriend with her movie co-star.  *Id.* 37:15-38:24, 40:34-43:53.  Enraged and heartbroken, Holt has no choice but to continue feeding Lucy what she wants.  *Id.*  After Kira dies, Holt is wracked with guilt and nearly kills himself and Julia when he crashes his car at 90 mph. *Id.* at 47:45-50:52.  Later in the series, Julia's severe injuries lead to a full blown drug addiction, the loss of her career and eventually her life.  Ep.7, 15:04-16:00; 32:22-36:46.  As Julia's star plummets, Holt's rises – with Lucy's help – and Lucy and Holt begin a charged sexual relationship fueled by his guilt and his "hatred" for Lucy.  Ep.6, 30:20-33:00; Ep.7, 3:59-4:39; Ep.8, 33:00-35:04.  When a rival magazine editor exposes their relationship to Julia, Julia nearly stabs Lucy to death, and is herself killed by Lucy's brother Leo in a hit and run as she flees the scene.  Ep.13, 39:11:40:55, 42:33-44:03; Ep.14, 0:40-1:32.

Another example is the subplot involving Prince Tyreese.  Also at Lucy's behest, Don pays a prostitute to seduce basketball player and avowed family man Prince Tyreese, the photographs of which Lucy later uses to blackmail him to get information about the disappearance and suspected murder of music artist Andre G.  Ep.1, 3:34-4:15, 6:46-8:21, 18:06-19:22.  After promising Tyreese protection, he unwillingly reveals that Andre G's manager

Tweedy McDaniels killed Andre G and keeps his severed head in a jar.  *Id.* at 31:36-33:52, 53:30-53:36, 45:18-38.  When a photo of the severed head appears on "Dirt/Now's" cover, Tweedy sends his "associates" to pressure Lucy's publisher, Brent Barrow, into giving up the source.  Ep.5, 19:28-21:48.  The associates have better luck when they threaten to castrate Barrow and feed him his penis.  *Id.*, 34:40-36:42.  Tweedy savagely beats Tyreese, smashing both his legs, and putting an end to his basketball career and almost his life.  *Id.*, 39:14-43:06; Ep.16, 0:21-49.  Though he is in terrible pain and can barely walk, Prince Tyreese finds redemption in the aftermath of the attack, thereby relieving Lucy of her role for having blackmailed him in the first place. Ep.16, 3:14-3:20, 3:45-4:54.

### b.  There Is No Protectable Similarity Between The Characters of The Works

Any similarity between the characters in the Screenplay and *Dirt* begins and ends with the fact that there are celebrity journalists, female editor-in-chiefs and schizophrenic artists in both works.  Any common character traits that flow naturally from that shared premise are unprotectable and cannot serve as a basis for infringement.  *See, e.g., Muller v. Twentieth Century Fox, Inc.*, 794 F.Supp.2d 429, 446 (S.D.N.Y. 2011); *Gal v. Viacom Intern., Inc.*, 518 F.Supp.2d 526, 546-548 (S.D.N.Y. 2005) (protagonists in thriller novel and thriller screenplay were both young, ambitious, divorced, female reporters, both investigating pharmaceutical companies, all of which the court determined were stock elements of the genre and could not form the basis of a copyright claim).[10]

### (i)  *Chase Anderson, Sandra, and Lucy Spiller*

Though he is a central protagonist in the Screenplay's love story of growth and redemption, Chase's character is remarkably undeveloped.  We meet him where he is: successful, alienated, and cynical, with little insight into how he got there, other than his love of music and the disappointment he suffered at the hands of his college professor.  Although Chase's feelings for Jared are the catalyst for his emotional growth and psychic transformation,

---

[10] In determining whether characters are similar, a court looks at the "totality of the characters' attribute and traits as well as the extent to which defendants' characters capture the total concept and feel of the figures in plaintiff's work." *Hogan*, 48 F. Supp.2d at 310 (internal quotations and citations omitted).

the shift is viewed externally through changes in his behavior not in his thoughts, and what motivates Chase or attracts him to Jared is never revealed.

Sandra, Music Slate's owner and Chase's boss and friend, is a minor supporting character whose primary function is to move the story line along, and provide moments of comic relief. Thus, Sandra is responsible for introducing Chase and Jared, creating the conflict that almost destroys their relationship, and then repairing that damage by protecting Jared's secret and releasing Chase to pursue Jared.[11]

In stark contrast, Lucy is a complex character, obsessed with revealing everyone's truth because she is unable to figure out why her father killed himself. Ep.86, 18:50-20:50. Wracked with guilt and haunted by his death twenty five years ago, Lucy's relationship with her mother, who desperately wants Lucy to move on, is so strained that Lucy ruins her mother's wedding day with a toast about her dead father. Ep.4, 19:00-20:26, 41:36-43:05. Her job as editor-in-chief of "Dirt/Now" defines her; she is married to the magazine, prefers it to human relationships, and is seen masturbating while pouring over cover photographs. Ep.2, 45:20-46:05; Ep.3, 16:55-17:23. Lucy's commitment to the truth tends to sanitize the sordid methods she unflinchingly employs to get her story. And the journalistic integrity she sometimes displays makes you almost forget that more often than not she is merely gossiping about celebrities and calling it "news." In the workplace, Lucy leads by example and encourages talent when warranted. She is unflappable under pressure and generally remains in control of her emotions. As *Dirt* winds its way to its conclusion and Lucy slowly admits that she is falling in love with Holt McClaren, there is no sea change as with Chase. Instead, everything remains the same, except that Lucy unwillingly agrees to Holt's ultimatum that they go public with their relationship and, for the first time, Don's well-being comes ahead of the shot he is getting her. EP.20, 0:00-19, 36:20-39:15.

In sum, though Lucy may share some generic character traits with Chase and Sandra that flow predictably from her role as a journalist and editor-in-chief of a magazine, the totality of

---

[11] Plaintiff also appears to be drawing parallels between Sandra, Chase's boss, and Lucy because they both are women at the editorial helm of a celebrity publication. Such generic similarities are not protectable. *See, e.g., Gal*, 518 F.Supp.2d at 546-548. In any event, as demonstrated above, the specific expressions of Sandra and Lucy's characters are totally dissimilar.

Lucy's attributes and traits are not remotely similar to either Chase or Sandra.  *See, e.g., Muller v. Twentieth Century Fox, Inc.*, 794 F.Supp.2d 429, 446 (S.D.N.Y. 2011)(while Dr. Graham and Woods were both women, and assets to their exploring teams, they couldn't have been more different).

### *(ii) Jared Keller and Don Konkey*

Protagonists Jared Keller and Don Konkey are dissimilar in every way, except that they are both schizophrenic artists who excel at their craft.  Again, such non-specific character traits are not protectable.  *See, e.g. Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986) ("foot chases and the morale of policemen, not to mention the familiar figure of the Irish cop, are venerable and often recurring themes of police fiction," and thus not protectable).

Jared is a gifted musician who is terrified that he will end up like his father, also a talented musician with schizophrenia who committed suicide when Jared was a baby.  Desperate to be normal, Jared refuses to accept his illness, which he keeps a secret, and believes he can cure himself by not taking his medication.  Unable to control himself or his destructive hallucinations, Jared turns towards drugs, and nearly destroys his family and then himself. Traumatized by his mother's rejection of him to save her family from ruin, Jared refuses to get help or get better, until he meets Chase who, unlike his mother, promises to be there for him. With regular medication and therapy, the hallucinations stop, Jared's career takes off and he finds happiness with Chase.

In marked contrast, Don Konkey is a photographer who matter of factly announces at every turn that he is a high functioning schizophrenic.  Ep.1, 28:38-29:04; Ep.2, 1:08:1:26. Don is quick witted, has an encyclopedic knowledge of the facts he needs to do his job, and is able to diagnose emotional disturbances at the drop of a hat.  Ep.1, 8:56-9:33, 19:30-20:14, Ep.8-25-50-25:59.  Unlike Jared, Don's schizophrenia greatly enhances his artistic sensibilities; while he is hallucinating, Don gets the shot no one else can.  Don, however, is caught.  Devoted to getting Lucy what she needs, and without the power to resist her, Lucy's work both focuses and eats at him.  And so, Don's hallucinations serve multiple purposes: they both keep him company and

become the outward manifestation of his conflict over Lucy's sordid assignments.  For example, after bribing his way into a crematorium to shoot Kira in her casket for Lucy's cover, to ease his guilt, Don hallucinates that he and the dearly departed Kira fall in love and that he is caring for her while they live together (and have sex).  Ep.2, 19:21-20:36; Ep.3, 29:42-30:18, 38:10-38-26; 43:52-44:19; Ep. 4, 1:29-2:15.  (This hallucination transpires over several episodes.)  As Lucy's assignments become more and more outrageous – demanding that Don leave the hospital to photograph her as she lies dying, Don's conflict becomes unmanageable and he decides to take his medication and become normal.  Eps.13 and 14.  As Don normalizes and he loses the ability to externalize his conflict through his hallucinations, he begins to stand up to Lucy.  Ep.18, 37-26-38:13.  Sometimes he refuses to take an assignment.  And sometimes he hides the truth from her because he realizes that people have a right to privacy and that some truths are just too destructive, regardless of whether they benefit Lucy or the magazine.  Ep.16, 11:30-28:00, 38:07-38:52.  But, his conscience comes with a price.  With the medication and without his hallucinations, Don's artistic sensibility dulls.  Where he once stood apart from the pack of paparazzi, getting the real shot, Don is now in their midst, getting the shot that everyone will have.  It seems a tradeoff both he and Lucy are willing to live with.

Finally, there are countless characters in *Dirt* without alleged or actual alleged counterparts in the Screenplay.  Likewise, other than Chase, Sandra and Jared, Plaintiff does not appear to be alleging that copies of any of the other characters in the Screenplay appear in *Dirt*.  The presence of characters in each work that do not appear in the other also weighs in favor of finding that the works are not substantially similar.  *See, e.g., Flaherty v. Filardi,* 388 F.Supp.2d 274, 287-288 (S.D.N.Y. 2005).

In sum, no one would ever associate the characters in *Dirt* with those in the Screenplay.  They are just that different.

### c.  The Dialogue Is Not Substantially Similar

Plaintiff's allegation of four overlapping words fails as a matter of law to establish a substantial similarity between the dialogue in *Dirt* and that in the Screenplay.  *See, e.g., Muller v. Twentieth Century Fox Film Corp.*¸ 749 F. Supp.2d 429, 447 (S.D.N.Y. 2011).  Moreover, the allegedly similar dialogue – "dissed" to express being disrespected and "I am getting moist" versus "I am moist" to convey sexual excitement about a business interaction – follows from the scènes à faire of the genre of adult televisions drama involving fame and money, and cannot be the basis of copyright infringement.  *See, e.g. Green v. Lindsey*, 885 F. Supp. 469, 487-488 (S.D.N.Y. 1992) (finding dialogue "hackneyed" and thus not copyrightable for the purposes of a copyright claim - "I do not believe you could easily lift a sword," compared to "You could not even lift a warrior's sword."); *Muller,* 749 F.Supp.2d at 447 (finding the term "heat bloom" was not born in plaintiff's script, nor was it infused with such "creative spark" as to provide the basis for a copyright infringement claim).  At best, any similarity in protectable dialogue is *de minimis,* and hence not actionable.  *See, e.g., Flaherty v. Filardi,* 388 F. Supp.2d 274, 289 (S.D.N.Y. 2005).

### d.  The Central Themes of The Works Are Different

The central theme of the Screenplay and that of *Dirt* are vastly different.  At its core, the Screenplay explores the healing power of love between two damaged men while *Dirt* explores the destructive power of the truth when left uncensored. [12]  To the extent that both works have common themes involving celebrity privacy rights, freedom of the press, artistic integrity, parental loss, and the difficulty of mental illness, these themes flow naturally from a shared premise of a celebrity publication and a relationship with someone suffering from mental illness and are neither original nor protectable.  *See, e.g. Muller,* 794 F.Supp.2d at 445.

### e.  The Pace is Completely Different

There is little that could be considered similar about the pace in the Screenplay and in *Dirt*.  The Screenplay is over a hundred pages long – about the length of a feature film – and the action takes place within a one year period.  Although occasionally punctuated with fast-paced

---

[12] Naturally, each episode of *Dirt* has its own integral theme, in addition to its own plot and place.  For example, the key theme of episode 6 is incest and sexual abuse in the religious community.

sequences, which generally mirror Jared's internal turmoil, the overall pace of the Screenplay is slow and deliberate as Chase and Jared slog through their emotional baggage.  Towards the end of the Screenplay, the pace picks up as Chase and Jared throw off the chains of their past and chase each other like children.

In contrast, *Dirt* belongs to the genre of the hour-long television drama, and unfolds over years in twenty episodes.  *Dirt* is fast paced – even frenetic – and action packed, moving quickly between the editorial meeting room, high speed celebrity chases, and sexual and drug infused liaisons.  Regardless, similarity in pace without more "does not create an issue of substantial similarity between the works." *Williams v. Crichton*, 84 F.3d 581, 589-590 (2d Cir. 1996).  As demonstrated, there is no substantial similarity between any elements of protectable expression.

### f.   The Moods of the Works Are Different

The mood of this unpublished Screenplay is initially somber, pensive and emotionally fraught, punctuated with bursts of hope as Jared and Chase fall in love.  As the story progresses, the mood begins to lighten, as Chase, but more so Jared, resolve their inner conflicts and find happiness.  The Screenplay ends on an almost joyous note, as Chase and Jared, both teeming with pride over Jared's accomplishments, are filled with love for each other.

*Dirt*, on the other hand, is an edgy nighttime adult drama that aired on a flagship entertainment cable network.  Its often sinister tone is permeated with the bacchanalian lifestyles of its characters.  Sex, drugs, and violence make frequent appearances, and the tone often reflects the intensity of the cover story Lucy is going for.  The tone also reflects Lucy's emotional isolation, and has few, if any, peaks and valleys, even when she falls in love.  Again, any similarity in mood must be protectable to support an infringement claim, and these are not.  *See, e.g., Zambito v. Paramount Pictures Corp.,* 613 F.Supp. 1107, 1111 (E.D.N.Y. 1985).

### g.   The Setting Does Not Establish Substantial Similarity

The works are set in different cities – *Dirt* takes place in Hollywood, while the story in Plaintiff's Screenplay takes place in New York City.  The mere fact that both works take place in a city is inconsequential and not a protectable element.  *See, e.g.,Hallford v. Fox Entertainment,*

*Group, Inc.,* No. 12-CV-1806 (WHP), 2013 WL 541370, at *5 (S.D.N.Y. Feb. 13, 2013).

## IV.   <u>PLAINTIFF'S CONVERSION AND CONSPIRACY CLAIMS ARE PREEMPTED</u>

Plaintiff's claims for conversion and conspiracy to convert must be dismissed with prejudice because Plaintiff's copyright infringement claim preempts them, and in any event they are not properly pled.  *See, e.g., Price v. Fox Entertainment Group, Inc.*, 473 F.Supp.2d 446, 460-461 (S.D.N.Y. 2007).

"The Copyright Act exclusively governs a claim when: (1) the particular work to which the claim is being applied falls within the type of works protected by the Copyright Act …, and (2) the claim seeks to vindicate legal or equitable rights that are equivalent to one of the bundle of exclusive rights already protected by copyright law." *Id.* at 456-457.  The first prong of this test "is satisfied if the claim applies to a work of authorship fixed in a tangible medium of expression and falling within the ambit of one of the categories of copyrightable works." *Id.* And the second prong "is satisfied only when the state-created right may be abridged by an act that would, by itself, infringe one of the exclusive rights provided by federal copyright law." *Id.* Plaintiff's copyright claim satisfies both prong, and his state claims are preempted.

The first prong is easily satisfied because the registered Screenplay is the subject of both Plaintiff's conversion and conspiracy to convert claims as well as his copyright infringement claim.  *See, e.g., Price*, 473 F.Supp.2d at 460.

The second prong is satisfied because Plaintiff alleges that ABC converted and conspired to convert the Screenplay and the rights associated with that Screenplay for its own use and benefit.[13]  And, because those claims are rooted in ABC's alleged unauthorized copying of ideas and other purported elements of the Screenplay, *i.e.* its alleged wrongful use, not wrongful possession, no "extra elements" are required to prove them.  *See, e.g., Gary Friedrich*

---

[13] New York law defines conversion as "any unauthorized exercise of dominion or control over property by one who is not the owner of the property which interferes with and is in defiance of a superior possessory right of another in the property." *Atlanta Shipping Corp. v. Chemical Bank*, 818 F.2d 240, 249 (2d Cir. 1987)(quoting *Meese v. Miller*, 79 A.D.2d 237, 242, 436 N.Y.S.2d 496, 500 (NYAD 4th Dep't 1981).  Plaintiff has failed to plead these elements. In addition, New York does not recognize civil conspiracy to commit a tort, including **conversion**, as an independent cause of action.  S*ee Hebrew Inst. for Deaf and Exceptional Children v. Kahana*, 57 A.D.3d 734, 735, 870 N.Y.S.2d 85 (NYAD 2d Dep't 2008).  Accordingly, Plaintiff's claim alleging "conspiracy to commit a tort stands or falls with the underlying tort." *Dickinson v. Igoni*, 908 N.Y.S.2d 85, 88 (NYAD 2d Dept. 2010).

*Enterprises, LLC v. Marvel Enterprises, Inc.*, 713 F.Supp.2d 215, 229 and 231 (S.D.N.Y. 2010)

(plaintiff's copyright claim pre-empted state law claims for conspiracy and conversion because

the claims are rooted in allegations of copying ideas and do not require an extra element of proof

*Id.* (citing *A Slice of Pie Productions, LLC. v. Wayans Brothers Entertainment*, 392 F.Supp 2d

297, 317 (D. Conn. 2005); *Miller v. Holtzbrinck Publishers, LLC,* No. 08 Civ. 3508 (HB), 2008

WL 4891212, at *3 (S.D.N.Y. Nov. 11, 2008)(finding preemption of ideas stolen from

manuscript).

Because the conversion and conspiracy claims fail, Plaintiff's demand for punitive

damages must also be stricken as "punitive damages are not available under the Copyright Act of

1976." *Granger v. Gill Abstract Corp.,* 566 F.Supp.2d 323, 330 (S.D.N.Y. 2008).

## V.    **CONCLUSION**

For all of the foregoing reasons as well as those in the accompanying declarations and

exhibits, ABC respectfully requests that this Court grant ABC's motion and dismiss Plaintiff's

Amended Complaint in its entirety with prejudice, without leave to replead.

Respectfully submitted,

Dated: New York, New York          SCHWARTZ & THOMASHOWER LLP
      September 30, 2016

By:    *s/Rachel Schwartz*
     Rachel Schwartz
     15 Maiden Lane, Suite 705
     New York, NY  10038-5120
     Tel: 212-227-4300
     Email: *rschwartz@stllplaw.com*

     *Attorneys for Defendant*
     TOUCHSTONE TELEVISION
     PRODUCTIONS, LLC, d/b/a ABC STUDIOS